# CHARLESTON.

GAIN *et al.* v. SOUTH PENN OIL CO. *et al.*

Submitted September 14, 1915. Decided October 19, 1915.

MINES AND MINERALS—*Production of Oil and Gas—Draining of Adjoining Lands.*

   G, owning 55 acres of land, including all minerals therein, by deed conveyed the tract to C, reserving only ''one half of all the oil and gas found or developed'' in and from the eastern half thereof. C's title, by judicial sale, passed to R, who executed an oil and gas lease, containing the usual terms and conditions, to an oil company,

which drilled and operated thereunder two productive oil wells near the western boundary of the reservation. The lease, in legal effect, limited the operations of the lessee to the portions of the tract lying outside the reservation. But, although the wells so drilled and operated may, by reason of their proximity to the division line, in fact drain oil from the eastern half, such operations, in the absence of special circumstances or relations between the parties, afford no basis for a claim to a share in or an accounting for the oil so produced, or for a receivership thereof.

Appeal from Circuit Court, Doddridge County.

Suit by Peter Gain and others against the South Penn Oil Company and others. From decree for defendants, plaintiffs appeal.

*Affirmed.*

*G. W. Farr,* for appellants.

*A. B. Fleming, Charles Powell* and *Kemble White,* for appellees.

LYNCH, JUDGE:

In a deed conveying to Salathiel Cutright 55 acres of land in Doddridge county, Peter Gain and wife reserved "one half of all petroleum or oil and gas, *est.*, found or developed on the east side of run or *drean* running from the S to N, with the meanderings of said *drean,* from N to lands of Jimason Hutson at S part of said land". Under judicial proceedings to enforce a vendor's lien retained in the deed, Mary Randolph became the owner of the same tract subject to such reservation. On May 3, 1898, she and her husband leased the entire tract to the South Penn Oil Company for the production of oil and gas, retaining as compensation an advance quarterly payment of fourteen dollars for delay in drilling and one eighth of the oil produced from the land. To the lessors the oil company promptly paid the delay rental until April 1, 1907, the date of the completion of the first well located and drilled on the leased premises, operations therefor having begun in December, 1906. In August, 1907, the lessee located its well number 2 on the same land, and completed it the ensuing December. In both wells was found oil in paying quantities, and distributed to the persons thereto entitled under the terms of the lease.

Peter Gain and his wife Harriet, at June rules, 1908, filed an original bill in the circuit court of Doddridge county against the Randolphs, the South Penn Oil Company and the Eureka Pipe Line Company, and, at January rules, 1909, an amended bill introducing as additional defendants grantees of the Randolphs of half the royalty oil reserved by them in the lease. The bills contained the same averments and prayer for relief. They charged fraud in the procurement, execution and operation of the lease and the disposal of the oil produced from the two wells, and prayed cancellation of the lease in so far as it embraces the part of the land east of the drain, an accounting, the appointment of a receiver for the wells, and other relief general and special. On final hearing, upon pleadings and proof, the suit was dismissed, with costs against plaintiffs. Hence this appeal.

The charge of fraud is directed against the South Penn Oil Company and the Randolphs. As to other defendants, there is no such imputation. Plaintiffs aver that the purpose to be effected by the parties to the lease was to defraud them of their share of the oil contained within the eastern portion of the land, in the record denominated. the "reservation"; that, in derogation of their rights therein, the lease granted the lessee the right to operate on any part of the tract, within or without the reservation, remove the oil therefrom, and divide it among themselves. The lease does not, indeed, make or purport to make any provision for compensation to plaintiffs, or in any way refer to the so-called reservation.

Although the recordation of the deeds to Cutright and Mrs. Randolph afforded constructive notice to the oil company, they say they had no actual knowledge of any rights reserved to plaintiffs in either deed; that they did not discover such reservation until they caused the title to be examined preparatory to active operations on the land leased; and that thereupon they prepared and requested Peter Gain to execute the instrument filed as exhibit "compromise agreement", noting the existence of the outstanding claim as to half of the oil and gas east of the drain as described in the deed to Cutright, defining the interests of the several claimants of the oil productions from the tract, and to each of them apportioning his share thereof as therein determined, the

share or interest of the plaintiffs so fixed being one-sixteenth of the production from the eastern half of the land or such part of it as lay east of the designated drain. This paper Peter Gain declined to execute, for the reason, assigned by him, that "they don't offer me a penny, nor they don't say they will ever put a well on my reserve, and I said I had been debarred out of my rights up there for ten or twelve years, and they still want to". Of what rights he had been "debarred", he does not disclose. He conveyed to Cutright all the estate he had in the land, except the share of the oil reserved. He then had no valid reason for refusing to join in that paper, unless, as he now seems to pretend, he was entitled to one half of the oil and gas produced from such portion. But on that claim he did not then base his refusal to join in execution of that paper. Nor in the Cutright deed did he reserve a share in the delay rental. Under the terms of the lease, it was due and payable to his grantees. But Wilbur Gain, the agent entrusted by the lessee with the duty of securing the due execution of the paper, said the only excuse given by Gain was that he would not sign any paper with the signatures of the Randolphs affixed to it.

But, whatever may have induced him to withhold his approval, the outstanding and controlling fact is that the agreement was prepared and presented to adjust amicably the very questions now in issue in this controversy. If executed, all matters herein involved would have been eliminated. By it the lessors and lessee conceded plaintiffs an equal share of the usual oil royalty in productions obtained from the land designated as the reservation. Its purpose was to adjust any misunderstanding and remove any friction then existing between the hostile claimants of the oil produced from any part of the land. Manifestly, such was its aim and effect. The Randolphs signed and acknowledged it for that purpose, thereby completely negativing any intention on their part to preserve to themselves any undue advantage secured by the lease to the oil company. Or, granting an original design to acquire unlawfully a greater share than was justly due, the execution of the paper would have restored the parties to their former status in respect of their rights in such production. With what consistency, then, can fraud be imputed

to defendants? Plaintiffs, theretofore, had suffered no damage or loss. No invasion of their rights had occurred; no oil removed from the land; no injury done.

Plaintiffs further charged that, in violation of the rights reserved to them, defendants, through the two drilled wells, fraudulently have drawn from the reservation oils not their own, and appropriated the proceeds thereof in contravention of such rights. This result they ascribe to the well locations, which they charged were either on the reservation or near its western boundary, wherefore in the operation thereof their share of the oils necessarily have been and now are being withdrawn and utilized by defendants. Upon plaintiffs devolved the burden of proving the allegations of their bills; and hence, by a preponderance of the evidence, they must support the charges made as to the fact and purpose of the well locations. Any doubt arising therefrom must be resolved in favor of the decree under review.

That the first well, in the record denominated ''Randolph No. 1'', was not located east of the drain mentioned, and hence not drilled on the reservation, though near its boundary line, the proof clearly shows. Peter Gain so testified, but added that, by excavations and fills, the lessee had caused the channel of the drain to be moved eastward from its former location. Davis, who at Gain's request surveyed the lands, likewise testified, except as to the changed course of the channel. Of that he knew nothing save from appearances, and they did not convince him. Smith said that well was east of the drain, and that such change had been made. But testimony given and surveys made by civil engineers, including Davis, showed conclusively that well number 1 was five to twenty-seven feet west of the drain, Davis placing the distance at five feet from the channel contended for by plaintiffs. But the claim that defendants changed the course of the water flow at that point was not sufficiently supported by proof.

The second well, known as ''Randolph No. 2'', was drilled near the Hutson line on the south, and, though as to its location relative to the drain mentioned the evidence was not wholly free from doubt, it sufficiently preponderated against plaintiffs' pretensions. Approximately half the distance northward, the Randolph farm is steep, and broken eastward

and westward by ridges and corresponding depressions or gulleys of different elevations and depths, and in relation to each other approaching downward towards the lower levels, and in wet seasons emptying the water collected by drainage into a definitely defined conduit and thence into the Smith lands on the north. This situation or condition the contour map filed by Drake made obvious. But no positive or convincing proof established or tended to establish, any definite or common source of drainage from that portion of the premises. The diverse conclusions of the civil engineers who surveyed the land at the instance of each of the parties emphasized this fact. They found springs at the head of some of the ravines examined by them on opposite sides of a north and south line through the land, and swamp grass therein indicating moisture, whence they concluded the location of the drain mentioned as one of the boundaries of the reservation was as fixed by them. In view of the claim asserted by plaintiffs as to their right to share in the productions from the portion of the land east of the drain, and their refusal to execute the compromise agreement, the oil company located both wells, and to Shira, its field superintendent, gave explicit directions that each well ''must be located west of the drain''. E. C. Tabler, the company's civil engineer, measured on the ground the distance designated on the location plat furnished by the company, and, pursuant to such instructions, he and Shira made a careful examination of the leased premises, the general course of the stream referred to if such it may be called, and the surrounding circumstances and conditions, whence they agreed in saying that well number 2 was located and drilled pursuant to the express mandate of that company. Tabler further added that there was no drain west of the well. Charles Drake corroborated their statement as to the relative positions of the well and drain. Lee Taylor, who at the request of Peter Gain accompanied J. M. Martin, a civil engineer employed by Gain to ascertain and by a survey to determine the general course of the drain, as a witness for defendants said: ''Taking the general direction of that, as it actually is, number 2 would be on the west side of this drain''. J. H. Riley and R. G. Foutty corroborated the other witnesses mentioned.

Opposed to this testimony was that of Peter Gain, who said he "claims" that well is east of the drain; of E. E. Smith, the owner of the land adjoining on the north, that he thought "It laid east of the drain"; and of E. G. Davis, who, as he virtually admits, surveyed only as directed by Gain, that "as he saw it" that well is east of the drain. The testimony introduced by plaintiffs to support their contention was insufficient to overcome the positive and unequivocal evidence offered by the oil company to show compliance with its explicit direction to avoid locating wells on the reservation.

But plaintiffs further impute to defendants the perpetration of a fraud by withdrawing oil from the reservation through the wells drilled near the drain. This accusation, however, ignored the right, conferred by the lease upon the oil company, to exercise its own judgment in the selection of sites for its productive operations, so long as it refrained from an actual entry on the reservation. Of course, the defendant oil company did not, nor does it now, assert any right to enter on any part of the premises wherein plaintiffs have an interest, and denied it had so entered in derogation of their rights and interests in the oil reserved. On these, indeed, it lawfully could not encroach. The mere execution of such instrument raised no inference of a fraudulent intent, and justified no implication of a purpose to wrong plaintiffs; and if it be true, as plaintiffs contend, that part of the oil produced came from the reservation, that fact alone formed no basis for an accounting or for a receivership for the two wells. The oil company owed them no duty legal or contractual. It sought, but failed, to secure a contract permitting entry on the reservation and removal therefrom of the oil therein contained and providing for an equitable distribution of it. Without such agreement, the operations of the lessee necessarily were limited to the western half of the lands leased. On this part it did successfully explore. On what principle plaintiffs base their right to the relief prayed they have not definitely pointed out. They contend, it is true, for a share of the productions secured by the defendants from the two wells drilled. But such productions lawfully were obtained. As heretofore observed, the lessee had the right to enter on any portion of the land west of the drain, and, hence, so near

the division line as to drain oil from land east or west of it, without liability to plaintiffs. *Barnard* v. *Gas Co.*, 216 Pa. 362; *Kelly* v. *Oil Co.*, 57 Ohio 317; *Brown* v. *Spillman*, 155 U. S. 665. These cases involved the rights of the owners of adjoining lands, it is true; but in what respect does that fact alter the rule of law laid down by them? No reasonable difference in the application of the legal principle is perceived. The mere community ownership does not differentiate the cases. Plaintiffs complained that the Randolphs leased the entire tract, implying that lawfully they could have leased part of it. Had they confined the lessee's operations for oil to such part, or leased it only, the oil company could have selected the sites for its operations and accomplished the same result. On what theory, then, can plaintiffs justify their prayer for relief in the one case and not in the other? The result of the operations would be the same in each instance; and we think the mere difference in the situation is immaterial and unimportant. In either case the rights of the lessee would be the same. Hence, the decree correctly denied relief by an accounting.

Nor did plaintiffs' right to a receivership stand on a more substantial basis. This case did not present a situation similar to that in *Fuel Co.* v. *Burdett*, 72 W. Va. 803, wherein a receiver was appointed. There the lessees conducted their operations on tracts between which lay another tract, separate interests in which they held under lease, but could not or intentionally would not agree on the mode or manner of conducting operations thereon; hence the necessity of a receivership in order to prevent exhaustion by the drainage of the oil estate therein to the manifest injury and prejudice of the owners of the land. No such condition or situation was presented here; and plaintiffs have shown no right to that relief and no authority for it.

Other questions discussed by counsel were not determined by the circuit court, doubtless because not deemed essential to a decision on the merits. On them the decree is not based. Nor do we now deem any reference thereto necessary.

Finding no error, we affirm the decree of the lower court.

*Affirmed.*