902 F.2d 1143
 Ottaway TRENT, Executor of the Estate of Woodrow Trent,
deceased; Mildred Jean Blankenship, heir of
Hassell Richmond Blankenship, deceased;
Harold R. Deitz; John H.
McCutcheon, Plaintiffs,
v.
ENERGY DEVELOPMENT CORPORATION, a Virginia Corporation,
Defendant-Appellant,
v.
Joe CASSADY; Patty Cassady, Third-Party Defendants-Appellees.
 No. 89-2144.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 8, 1990.
Decided May 8, 1990.
 
 Wayne Lewis Evans, Katz, Kantor & Perkins, Bluefield, W.Va., for defendant-appellant.
 Wade Thomas Watson, Sanders, Watson & White, Bluefield, W.Va., for third-party defendants-appellees.
 Before ERVIN, Chief Judge, and HALL and WILKINSON, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 Energy Development Corporation ("EDC") appeals from the order entering summary judgment on its third-party complaint in favor of Joe and Patty Cassady. Finding no error, we affirm.
 
 I.
 
 2
 On September 15, 1978, EDC entered into a natural gas lease with the Cassadys to drill a gas well on their 5.61-acre tract of land in McDowell County, West Virginia. The lease granted the Cassadys a standard "royalty for all gas produced, saved and marketed from the leased premises equal to one-eighth ( 1/8th) of the proceeds received from the sale [at the prevailing marketing price] of gas at the pipe line [sic]." On May 17, 1979, EDC began drilling on the tract.
 
 
 3
 Shortly after drilling began, the owners of an adjacent, much larger tract of land (the "landowners") came to the well site and claimed that the well was being drilled on their property. They threatened to enjoin the operation unless EDC executed a written agreement giving them an interest in the well. Reluctantly, EDC agreed. To insure their position, the landowners also persuaded Joe Cassady to sign a temporary agreement entitling them to a portion of his royalty interest in the well. The parties to this handwritten contract agree that it was effective only until the landowners and EDC executed their agreement.
 
 
 4
 On May 18, 1988, a written agreement was signed by the landowners and EDC. In it, the landowners received a 1/16th overriding interest in EDC's 7/8ths interest in the well's production. In return, EDC acquired surface rights-of-way and a promise from the landowners not to drill an offset well within 1600 feet of the Cassady well. Subsequently, the Cassady well was completed and went into production on June 6, 1980. The Cassadys have received a full 1/8th royalty on all gas produced from the well since that time. The landowners claim that they have received nothing under their agreement with EDC.
 
 
 5
 On December 17, 1986, the landowners filed suit against EDC in state court, seeking payment of their 1/16th overriding interest. EDC answered the complaint and counter-claimed, contending that the override contract was invalid because it was procured by fraud and signed under duress. At the same time, EDC removed the case to district court. On May 26, 1988, EDC filed a third-party complaint against the Cassadys, claiming that the Cassadys are responsible for any money that EDC might be found to owe the landowners. This claim was based on the gas lease between EDC and the Cassadys, the handwritten agreement between Joe Cassady and the landowners, and W.Va.Code Secs. 22-7-1 et seq. ("the Act"), which, under certain circumstances, requires the pooling and unitization of the interests of royalty owners of natural gas resources.
 
 
 6
 After discovery, the Cassadys moved for summary judgment on the third-party complaint. On May 25, 1989, the district court granted the motion and entered summary judgment in favor of the Cassadys. The court held that the Act did not apply to the dispute and that the contracts among the parties left no doubt that the Cassadys owe no monies to either EDC or the landowners. After the district court entered final judgment on the complaint pursuant to Fed.R.Civ.P. 54(b), this appeal followed.
 
 II.
 
 7
 In essence, EDC raises three arguments before this Court. First, it argues that the district court erred in holding that the Act was inapplicable. It contends that the landowners made a timely objection to the drilling of the well which triggered the pooling and unitization provisions of the statute. Second, it contends that the district court erred in granting summary judgment on its contract claim. It argues that the 1/8th royalty provision granted the Cassadys a royalty only for the gas which was originally located under their tract, the "leased premises," and not for any gas which migrated from under the landowners' tract. EDC further contends that the gas indigenous to the Cassady tract was quickly produced and, consequently, the Cassadys were not entitled to any royalties from the well after approximately June 1981. Finally, EDC argues that the district court's decision offends both its and the landowners' "correlative rights" to the common pool of natural gas, which underlies both properties and is being drained by the Cassady well. We address EDC's statutory argument first.
 
 
 8
 In order to appreciate this argument, a brief review of the Act is in order. The Act was passed in 1985 to address the difficulties inherent in natural resource production in West Virginia.[1] The goal of this legislation is to "[f]oster ... the fullest practical exploration, development, production, recovery and utilization of this state's coal and gas" where full production of both minerals from beneath the same surface lands interferes with the rights of either the coal owners,[2] the gas royalty owners,[3] or the gas operators.[4] W.Va.Code Sec. 22-7-1(a)(2), (b). In furtherance of this goal, the Shallow Gas Review Board was established "to regulate and determine the appropriate placing of shallow wells[5] when gas well operators and owners of coal seams fail to agree on the placing of such wells." Id. Sec. 22-7-1(b). The applicability of the statute and, correspondingly, the authority of the Review Board are triggered by the filing of an objection by a coal seam owner with the director of the division of oil and gas of the department of energy pursuant to W.Va.Code Sec. 22B-1-17. Id. Sec. 22-7-3(b)(4). Once such objection is filed, the Board is authorized to hold a settlement conference to resolve the dispute. Id. Sec. 22-7-7(a). If the parties fail to reach an agreement and the Review Board subsequently determines that a drilling permit should not be issued, a gas operator may then apply to the Review Board for the establishment of a drilling unit.[6] Id. Sec. 22-7-9(a). When this application is filed and after all concerned parties have had an opportunity to be heard, the Review Board then, if it finds appropriate, is empowered to establish drilling units and order the pooling of royalty owners' interests. Id. Sec. 22-7-10.
 
 
 9
 This brief overview of the statute makes manifest its inapplicability to the instant situation. The Act provides a mechanism to resolve disagreements between coal owners and gas owners and operators when the potential commercial development of one mineral interferes with the potential commercial development of the other. No such disagreement is present here. This was nothing more than simple boundary line dispute among the owners of two parcels of land and an interested gas operator. The Act's regulatory scheme was never intended to apply in such a situation.
 
 
 10
 EDC's contention that the landowners' initial protest that the well was on their property triggered the applicability of the statute in no way alters this result. Assuming for the sake of argument that the statute did apply to this type of dispute and that the landowners' protest was an objection to the location of the well for purposes of the Act, EDC has not alleged that it has even made an application to the Review Board for the establishment of a drilling unit. The statute expressly requires such an application before a gas operator can invoke its pooling and unitization provisions. Id. Sec. 22-7-9(a). EDC's failure to first turn to the Review Board is thus fatal to its statutory argument.
 
 
 11
 Furthermore, it is not lost upon us that the West Virginia legislature intended this statute as a means to foster settlements and to facilitate the orderly development of the State's natural resources. Here, EDC is attempting to use the Act as a means to resurrect a dispute that was settled some ten years ago. The statute is clear that such voluntary resolutions of these disagreements are to be strongly encouraged. We cannot countenance a use of the Act so contrary to that policy. EDC, faced with a claim by the landowners, made a decision to settle that claim by contract. Consequently, that contract is where it must look for its remedy. We affirm the district court's ruling that the Act is inapplicable.[7]
 
 III.
 
 12
 Turning to EDC's remaining arguments, we are not persuaded that summary judgment on the contract claim was in error. The lease between EDC and the Cassadys cannot be more plain. The Cassadys were to be paid a royalty based on "all gas produced, saved and marketed from the leased premises equal to 1/8th of the proceeds...." EDC's argument that this entitled the Cassadys only to a royalty for the gas which was originally located under the "leased premises" and not all gas produced from the well is directly contrary to West Virginia law. As the district court properly noted, West Virginia recognizes the venerable common law doctrine of capture:
 
 
 13
 [Oil and gas] belong to the owner of the land, and are part of it, so long as they are on it or in it subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.
 
 
 14
 Brown v. Spilman, 155 U.S. 665, 670, 15 S.Ct. 245, 247, 39 L.Ed. 304 (1895) (citations omitted); see also Gain v. South Penn Oil Co., 76 W.Va. 769, 775-76, 86 S.E. 883 (1915) (a lessee of tract A may, through a well on tract A, drain oil from tract B without liability to tract B's lessees). Thus, as a matter of law, royalties were due on all gas produced from the well, regardless of its original location, because the gas was the property of the owners of the "leased premises," the Cassadys.[8]
 
 
 15
 Similarly unavailing is EDC's argument that the lower court's holding is in disregard of the landowners' and its correlative rights. "Correlative rights" is defined in W.Va.Code Sec. 22-7-2(7) as "the reasonable opportunity of each person entitled thereto to recover and receive without waste the gas in and under a tract or tracts, or the equivalent thereof." Of course, our holding that the Act is inapplicable to this case completely undermines this argument to the extent that it is based on EDC's statutory rights. Furthermore, insofar as EDC attempts to assert the landowners' correlative rights in the production of the common gas pool, it is obviously in no position to do so. The landowners were certainly free to sue the Cassadys but chose not to do so. Thus, their correlative rights are not in issue.
 
 
 16
 What is left of EDC's final argument is an assertion that its payment of the 1/8th royalty on all gas produced from the Cassady well is in derogation of some common law correlative right to equitably share in the production of the common gas pool. This argument is completely baseless. As a gas operator, any interest that EDC has in the natural gas pool underlying the Cassadys' tract and the landowners' tract arises not from the common law, but solely from EDC's contracts with those parties. As to the Cassadys, for the right to drill the well on their tract and to market the gas produced therefrom, EDC promised to pay a royalty equal to 1/8th of the proceeds of the gas' sale at the prevailing market price. EDC does not contend that it paid the Cassadys more than the full 1/8th royalty. Thus, because EDC failed to assert an essential element of its case, i.e., that the Cassadys were overpaid under the terms of the lease, summary judgment on its claim was entirely appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 IV.
 
 17
 In sum, for the reasons stated above, the judgment of the district court is affirmed.
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 Although enacted in 1985, the provisions of the statute generally can be applied to any well where the permit application was filed after 12:01 A.M. August 1, 1978. W.Va.Code Sec. 22-7-3(c)
 
 
 [2]
 " 'Owner' when used with reference to any coal seam, shall include any person or persons who own, lease or operate such coal seam." W.Va.Code Sec. 22-7-2(16)
 
 
 [3]
 " 'Royalty owner' means any owner of gas in place, or gas rights, to the extent that such owner is not a gas operator as defined in subdivision (13) of this section." W.Va.Code Sec. 22-7-2(20)
 
 
 [4]
 " 'Gas operator' means any person who owns or has the right to develop, operate and produce gas from a pool and to appropriate the gas produced therefrom either for himself or for himself and others...." W.Va.Code Sec. 22-7-2(13)
 
 
 [5]
 " 'Shallow well' means any gas well drilled and completed in a formation above the top of the uppermost member of the 'Onondaga Group'...." W.Va.Code Sec. 22-7-2(21)
 
 
 [6]
 " 'Drilling unit' means the acreage on which the board decides one well may be drilled under section ten [Sec. 22-7-10] of this article." W.Va.Code Sec. 22-7-2(11)
 
 
 [7]
 Appellant also argued at length in its brief that the lower court erroneously held that the statute's application to this well was unconstitutional. Although we do not read the dicta in the lower court's decision so broadly, our holding that the statute does not apply obviates any need to rule on the constitutionality of its retroactive application
 
 
 [8]
 EDC argues that the production of the Cassady well should not fall within the rule of capture because the flow of gas from the landowners' tract was unnaturally enhanced by hydrofracturing, a process whereby the producing strata is fractured to increase the strata's permeability and, as a consequence, the flow of gas into the well. Short of committing a trespass, however, the law of capture allows a landowner "to use artificial means of stimulating production even though the effect is to increase the drainage from the land of another." Kuntz, The Law of Oil & Gas, Sec. 4.1 (1978). Although not alleged here, any trespass cause of action based upon hydrofracturing, if in fact such a cause of action exists in the common law of West Virginia, would belong to the landowners, not EDC