591 S.E.2d 135

**ENERGY DEVELOPMENT CORPORATION, Plaintiff Below, Appellant,**

v.

**Nancy Louise MOSS, et al., Defendants Below, Appellees,**

**West Virginia Coalbed Methane Review Board, Appellee.**

**No. 31238.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 2003.

Decided Nov. 20, 2003.

Dissenting Opinion of Justice Albright Jan. 8, 2004.

Starcher, C.J., concurred and reserved the right to file an opinion.

Albright, J., dissented and filed opinion.

578

Richard L. Gottlieb, Esq., Webster J. Arceneaux, III, Esq., Lewis, Glasser, Casey & Rollins, Charleston, for Appellant.

Donald R. Johnson, Esq., Roanoke, VA, for Nancy Louise Moss, Appellee.

Thomas N. McJunkin, Esq., Blair M. Gardner, Esq., Stephanie H.D. Mullett, Esq., Jackson & Kelly, Charleston, for GeoMet, Inc.

Darrell V. McGraw, Jr., Attorney General, Christie S. Utt, Assistant Attorney General, Charleston, for West Virginia Coalbed Methane Review Board, Appellee.

MCGRAW, Justice.

The parties in this appeal contest the ownership of what is called "coalbed methane," which many refer to simply as "CBM." Coalbed methane, as its name suggests, originates in a coal seam. Traditionally viewed as a dangerous waste product of coal mining,

in more recent years coalbed methane has emerged as a useful, and thus valuable, source of energy. The specific question asked in this case is whether a standard oil and gas lease executed in 1986 conveyed to the lessee the right to drill into the lessor's coal seams in order to produce the coalbed methane. This is the only question that we address in this opinion.

We note at the outset that West Virginia contains huge reserves of coalbed methane [1] and that the safe and efficient development of this resource can be of great benefit to the citizens of this state by increasing property values, jobs, royalties, commerce, and tax revenues. Moreover, the production (versus the waste) of coalbed methane can help reduce our national dependence on imported fuels, and can have a beneficial impact on the environment.[2] As we examine the legal arguments of the parties, the statutes, and applicable case law, we bear in mind that the state would benefit from the safe, efficient, and prompt production of this valuable natural resource.

In a case we discuss at greater detail, *infra*, the United States Supreme Court has recently described coalbed methane and the process by which it is formed. After recounting the process by which decaying biological matter turns first into peat, and is then compressed into coal, the Court explained:

> The process in which peat transforms into coal is referred to as coalification. The coalification process generates methane and other gases. Because coal is porous, some of that gas is retained in the coal. CBM gas exists in the coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas "adsorbed" [3] on the solid surface of the coal, that is, held to the surface by weak forces called van der Waals forces. These are the same three states or conditions in which gas is stored in other rock formations. Because of the large surface area of coal pores, however, a much higher proportion of the gas is adsorbed on the surface of coal than is adsorbed in other rock. When pressure on the coalbed is decreased, the gas in the coal formation escapes. As a result, CBM gas is released from coal as the coal is mined and brought to the surface.

*Amoco Production Co. v. Southern Ute Indian Tribe,* 526 U.S. 865, 873, 119 S.Ct. 1719, 1724, 144 L.Ed.2d 22, 29 (1999) (internal citations omitted).

## I.

## FACTS

The appellees in this case, Hall Mining Company, Inc., and several individuals,[4] own

---

**1.** A U.S. Bureau of Mines estimate concluded that the United States contains over 300 trillion feet of CBM, about half of which is commercially feasible to develop. If accurate, CBM could be an energy source roughly equal to proven reserves of natural gas. *See,* W.L. Summers, *The Law of Oil and Gas* § 1151C (2003). Some knowledgeable in this field estimate that West Virginia has trillions of cubic feet of developable reserves of coalbed methane.

**2.** One scholar has noted:

While carbon dioxide has been the principle focus of attention, methane is also a significant "greenhouse gas." Although it is far less abundant than carbon dioxide, methane has 25–30 times the "radiative effect," and scientists believe that increased methane concentrations are responsible for roughly 15—20% of the global warming that has taken place in recent decades.

Jeff L. Lewin et al., *Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane,* 94 W. Va. L.Rev.

563, 585 (1992) (footnote omitted). However, worldwide underground mining is only responsible for less than "10% of total methane emissions from all human and natural sources," *Id.* at 586, and "the United States was responsible for 15 % of underground mining emissions." *Id.* at 587. Also, methane does not persist in the atmosphere as long as carbon dioxide. *See also,* U.S. Environmental Protection Agency, Coalbed Methane Outreach Program, (visited November 12, 2003) <http://www.epa.gov/coalbed>.

**3.** The term "adsorption," which means "the adhesion in an extremely thin layer of molecules (as of gases, solutes, or liquids) to the surfaces of solid bodies or liquids with which they are in contact" should not be confused with the more familiar term "absorption." *See, Merriam Webster's Collegiate Dictionary* 8 (10th Ed.1997).

**4.** The lower court described Hall Mining as "being in the business of acquiring real property which it then leases for the development of coal, oil and gas." The lower court also informs us that the ownership of each tract breaks down as

two tracts of land in McDowell County, a 300–acre tract described by the lower court as the "Upper Slate Creek Tract" and a 340–acre tract described as the "Lower Slate Creek Tract." The appellees jointly own the surface and all the minerals under the land, including the coal, oil and gas. Although one of the appellees is a mining company, it appears from the record that all the appellees jointly own all the possible interests in the two tracts, and that there had been no severance of the coal or any of the other minerals prior to the events at issue in this appeal.[5]

At some point in the mid–1980's, representatives of appellant Energy Development Corporation, Inc. (sometimes abbreviated as "EDC"), approached Hall Mining and inquired about leasing the oil and gas under the tracts in question. Counsel for Energy Development Corporation prepared the final versions of the leases, and on September 15, 1986, the parties entered into two essentially identical lease agreements, one for each tract. These leases purported to "let lease and demise" to Energy Development Corporation:

> all of the oil and gas and all of the constituents of either in and under the land hereinafter described in all possible productive formations therein and thereunder within the definition and meaning of the term "shallow well" as set forth and defined in [the West Virginia Code].[6]

Nowhere in the leases is there a explicit reference to coalbed methane, coalbed gas, or other such specific term.

The appellees maintain that, although Energy Development Corporation drilled as many as seven "conventional" gas wells on the leased tracts, at no time did Energy Development Corporation attempt to produce any coalbed methane. Sometime in 1998, a dispute arose between the parties concerning the payment of royalties, and the appellees filed suit against Energy Development Corporation. During the course of this dispute, Energy Development Corporation filed an answer and counterclaim on August 18, 1999, in which it asked the circuit court to declare that "EDC has the right to drill into the coal formations on the properties in question and produce natural gas therefrom, including coalbed methane." The record indicates that this is the first time the parties had any dispute over the issue of coalbed methane.

While the lower court action was pending, on August 15, 2001, the appellees entered into a new and separate agreement with another gas operator, GeoMet, Inc. The record indicates that GeoMet either specialized in, or had some prior experience in, the development of coalbed methane. The new leases expressly granted GeoMet the right to extract coalbed methane and explicitly required GeoMet to develop coalbed methane wells within a certain time period.

After negotiations not detailed in the record, the parties settled all other issues in the case, and by order dated October 22, 2001, the court re-aligned the parties, so that Energy Development Corporation became the plaintiff and the appellees became the defendants. By order dated December 12, 2001, the court denied Energy Development Corporation's motion for summary judgment and rejected its claim that the leases were unambiguous.

follows: The "Upper" tract is jointly owned by Hall Mining and five individuals, who are members of the Moss family. The "Lower Tract" is jointly owned by Hall Mining and 15 other individuals, who are members of the Harman family. However, we note that the number of owners listed by the lower court does not match the number of individuals listed in the style of this case.

5. An affidavit from Harris Hart, II, at one time the secretary-treasurer of Hall Mining, states that the appellees jointly owned the tracts "in fee, including the surface, timber, oil and gas, coal, and the coalbed methane." Another letter in the

record suggests that Hall Mining has an undivided 2/9th interest in both tracts, with the other appellees making up the remaining 7/9th. Thus, we are not faced with a situation where individual estates in land have been severed from one another and are owned by separate parties.

6. The code explains that, " '[s]hallow well' means any gas well drilled and completed in a formation above the top of the uppermost member of the 'Onondaga Group,' " and " '[d]eep well' means any well other than a shallow well, drilled and completed in a formation at or below the top of the uppermost member of the 'Onondaga Group.' " W. Va.Code § 22C–8–2 (1994).

The circuit court conducted a bench trial on March 4, 2002, in which it heard testimony from both sides regarding the circumstances surrounding the execution of the leases and the knowledge or understanding the parties had with respect to coalbed methane at the time they entered into the leases.

Witnesses for Energy Development Corporation testified that the company entered into its first oil and gas lease in 1975, and though Energy Development Corporation had drilled numerous conventional gas wells, it had never drilled a coalbed methane well prior to the signing of the leases in question, nor had it drilled a coalbed methane well in the sixteen years between the signing of the leases and day of the bench trial.[7] The lower court found that Energy Development Corporation, as it drilled through the coal-containing strata when drilling its conventional wells, failed to take that opportunity to conduct any tests or observations before sealing off the coal-containing strata with concrete "casing."[8] An expert witness for the appellees testified that this practice was inconsistent with the future production of coalbed methane. Testimony from both sides indicated that Energy Development Corporation did not conduct certain specific tests after the drilling equipment passed through the coal seams but before "casing" the well, which would have helped it evaluate the potential of the coal seams for the future production of coalbed methane.

Because the lower court considered the language in the leases to be ambiguous, it heard testimony regarding what knowledge the parties had about coalbed methane in 1986. Energy Development Corporation president William Evans testified that he first became aware of the economic potential of coalbed methane when Congress addressed the topic in the 1978 Tax Reform Act. He stated that his familiarity with a 1983 Pennsylvania case on the subject, his contacts with one of the parties in that case, and his reading of trade journals, all contributed to make him aware of the potential economic value of coalbed methane at the time he signed the 1986 leases with the appellees. Mr. Evans also testified that all, or most, of Energy Development Corporation's conventional gas leases contained the same "all oil and gas" language at issue in this case.

Mr. Evans and his son both testified that they had specifically discussed the issue of coalbed methane with Mr. C. Henry Harman (an original lessor, since deceased) and had actually traveled to Mr. Harman's home to discuss this matter. Dale Harman, a named lessor and a witness for the appellees testified that he had not heard of the economic potential of coalbed methane until 1990, and, to his (Dale Harman's) knowledge, Mr. C. Henry Harman had never met with anyone regarding the leases without having either himself (Dale Harman) or counsel for Hall Mining present.[9]

The lower court entered a lengthy and thoughtfully reasoned order dated June 19, 2002. The court held that the question of whether ambiguity exits in a lease is a question of law to be decided by the court. The court then noted that a lease may contain a "latent ambiguity," and that when considering a latent ambiguity, a court may look to extrinsic evidence, including common industry practices, and that a lease should be construed as of its date of execution. The court also found that a gas lease should be construed against the lessee, especially when the lessee solicits and prepares the lease.

The court found that the leases in question were, in its terms, "not unambiguous" in

7. However, the record indicates that Energy Development Corporation did have a "working interest" of approximately 4% in a coalbed methane well developed by two other gas companies.

8. An operator drilling a "conventional" gas well may often drill through a coal seam on the way to a deeper gas deposit, but the operator must seal the well off from the coal with "casing" by injecting concrete into the hole at the depth of the coal seam. *See* W. Va.Code § 22-21-1, *et seq*. (1994).

9. One issue that appeared significant to the trial court was that on cross-examination, neither Mr. Evans nor his son could remember any details of the location of Mr. Harman's house, or its interior. After hearing testimony from the appellees that the house was memorably located 300 yards from the road, through a gate, across a creek, high on a hill and stuffed with the glass collection of Mr. and Mrs. Harman, the court made a specific finding that it regarded the testimony of Mr. Evans and his son on this issue to be unreliable.

granting to Energy Development Corporation the right to develop coalbed methane, and made two broader conclusions that are contested by the appellants.

An oil and gas lease entered into before any commercial coalbed methane wells had been permitted and drilled in West Virginia and before West Virginia law contemplated coalbed methane development which leased to the lessee "all oil and gas" does not unambiguously grant the lessee the right to drill into the lessor's coal seams to produce coalbed methane. Because coalbed methane is unavoidably associated with coal and is not unambiguously part of the gas estate and since the leases were executed before any coalbed methane development had commenced in West Virginia, the 1986 leases are latently ambiguous on the issue of whether they granted EDC the right to drill into lessors' coal seams to develop coalbed methane.

An oil and gas lease entered into before any commercial coalbed methane wells had been permitted and drilled in West Virginia and before West Virginia law provided for the drilling and fracing of coal seams to extract and market coalbed gas does not give the oil and gas lessee the right to produce gas from coal seams retained by the lessor, absent language specifically providing for or clearly indicating the intention of the parties to allow for that right.

Appellant Energy Development Corporation maintains that the broad "all gas" language in the 1986 deeds conveyed to it the right to develop the coalbed methane, and that the lower court erred in finding to the contrary. While we believe the lower court's decision was broader than necessary,[10] for the reasons set forth below, we affirm the decision of the lower court.

## II.

### STANDARD OF REVIEW

We are asked to review the decisions made by the lower court in its bench trial. This Court has stated:

In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 1, *Public Citizen, Inc. v. First Nat'l Bank in Fairmont,* 198 W.Va. 329, 480 S.E.2d 538 (1996). The Court has also explained in greater detail that:

Since our decision in *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995), there can be no doubt that it is for a trial court to determine whether the terms of an integrated agreement are unambiguous and, if so, to construe the contract according to its plain meaning. In this sense, questions about the meaning of contractual provisions are questions of law, and we review a trial court's answers to them *de novo.* 194 W.Va. at 65 n. 23, 459 S.E.2d at 342 n. 23, citing *Thrift v. Estate of Hubbard,* 44 F.3d 348, 357–58 (5th Cir. 1995). However, when a trial court's answers rest not on plain meaning but on differential findings by a trier of fact, derived from extrinsic evidence as to the parties' intent with regard to an uncertain contractual provision, appellate review proceeds under the "clearly erroneous" standard. The same standard pertains whenever a trial court decides factual matters that are essential to ascertaining the parties' rights in a particular situation (though not dependent on the meaning of the contractual terms *per se).* In these types of cases, the issues are ordinarily fact-dominated rather than law-dominated and, to that extent, the trial court's resolution of them is entitled to deference.

*Fraternal Order of Police v. City of Fairmont,* 196 W.Va. 97, 100, 468 S.E.2d 712, 715 (1996) (footnote omitted). This Court has stated, in more direct terms:

---

10. The court also concluded that "[c]oalbed methane is inherently associated with coal, coal seams and the coal estate in land." We do not find it necessary to go so far in our reasoning to decide this case.

"The finding of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding." *Daugherty v. Ellis*, Point 6 Syllabus, 142 W.Va. 340, 97 S.E.2d 33 [1956].

Syl. pt. 6, *Cotiga Development Company v. United Fuel Gas Company*, 147 W.Va. 484, 128 S.E.2d 626 (1962). With these standards in mind, we now consider whether the circuit court erred in this case.

### III.

### DISCUSSION

#### A. Overview of Coalbed Methane

We are guided in our discussion by the public policy goals announced by the legislature with respect to coalbed methane, which note that it is both dangerous and valuable:

(b) It is hereby declared to be the public policy of this state and in the public interest to:

(1) Preserve coal seams for future safe mining; facilitate the expeditious, safe evacuation of coalbed methane from the coalbeds of this state, and maintain the ability and absolute right of coal operators at all times to vent coalbed methane from mine areas;

(2) Foster, encourage and promote the commercial development of this state's coalbed methane by establishing procedures for issuing permits and forming drilling units for coalbed methane wells without adversely affecting the safety of mining or the mineability of coal seams.

W. Va.Code § 22–21–1 (1994).

What we today call coalbed methane or CBM has also been called "fire damp," "coal gas," "coal seam methane," or "mine gas," and has long been regarded as one of a coal miner's greatest foes. Coalbed methane may

have produced more widows and orphans than any other workplace hazard. In two single West Virginia accidents, coalbed methane killed 440 miners, leaving 362 dead in the Monongah Mine Disaster in 1907, the worst mining disaster in American History, and 78 dead in the Farmington Mine Disaster of November 20, 1968.[11] Literally thousands of miners have been killed by it in America and throughout the world. The danger of coalbed methane, in part, prompted the federal government to act, as this court noted:

The Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91–173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 801 *et seq.*) was enacted in response to the Farmington Mine Disaster of November 20, 1968, wherein 78 coal miners lost their lives in a coal mine explosion. The Act's main purpose is to establish safety standards for the coal mining industry. *See* H.R.Rep. No. 563, 91st Cong. *reprinted in* 1969 U.S.Code Cong. & Ad.News 2503.

*Zirkle v. Zirkle*, 172 W.Va. 211, 212 n. 2, 304 S.E.2d 664, 665 n. 2 (1983). *See also, United Mine Workers of America International Union v. Parsons*, 172 W.Va. 386, 393 n. 3, 305 S.E.2d 343, 348–49 n. 3 (1983). This disaster also prompted the passage of West Virginia's "Black Lung" compensation law, the first in the nation (now codified at W. Va.Code, § 23–4B–1, *et seq.*), as well as the aforementioned national Act (now codified at 30 U.S.C. § 901 *et seq.*).

Having acknowledged that coalbed methane is dangerous, we also recognize that it is now also considered quite valuable. Our research indicates that operators have drilled several thousand wells in Appalachia. Our neighboring state of Virginia alone produced over seventy billion cubic feet of coalbed methane in the year 2002. Operators have drilled several hundred coalbed methane wells in West Virginia.[12] The majority of

---

**11.** We note that this opinion is being released on the 35th anniversary of the tragedy in Farmington.

**12.** Some operators drill vertical wells that pass through one more seams of coal. Other operators drill horizontal wells directly into the coal face, often from within an active or abandoned coal mine. Usually the operators will fracture or "frac" the coal, breaking it up so that it will release a greater quantity of gas. Drilling may be done prior to mining, in an effort to make the mine safer for the miners, or may be done after a mine has been abandoned. Wells may extend into the unmined coal, or may be drilled into an

this activity has occurred in McDowell and Wyoming Counties, although many other West Virginia counties contain substantial reserves of coalbed methane. As we have stated, we wish to take no action that would impede the safe production of coalbed methane, with the highest possible priority placed upon the safety of miners and due consideration given to our long established case law regarding mineral interests. We turn now to a consideration of the reasons the lower court provided for its decision.

### B. Ambiguity and Construction of the Lease

There is a great temptation in this case, urged on us by both sides, to wave a wand and declare coalbed methane to be either "coal" or "gas." The logic of either position is facially seductive; "coalbed methane" is indeed "methane" in that both have the same chemical composition; but "coalbed methane" is also intimately bound to the coal, which must be disturbed if coalbed methane is to be produced in paying quantities.[13] If we made such a simplistic finding, it would be short work to decide this appeal and end this opinion.

But the precise question we must answer in this opinion is not whether coalbed methane, for all purposes and in all cases, *is* "coal" or *is* "gas." The specific question we must answer is whether a gas lease executed in 1986, before the widespread commercial production of coalbed methane in West Virginia, signed by a lessor who owned the land, coal, oil and gas,[14] conveyed to the oil and gas lessee the right to develop the coalbed methane, absent any specific language on the issue.

■ Although we are considering a lease in this case, much of our case law concerning contracts, in general, and deeds, in particular, offers us guidance. Clearly the question

of whether or not these leases are ambiguous presents a question of law for the court to decide: "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. pt. 1, *Berkeley County Pub. Serv. Dist. v. Vitro Corp.*, 152 W.Va. 252, 162 S.E.2d 189 (1968); *accord*, syl. pt. 1 *International Nickel Co. v. Commonwealth Gas Corp.*, 152 W.Va. 296, 163 S.E.2d 677 (1968); syl. pt. 3 *Fraternal Order of Police, Lodge Number 69 v. City of Fairmont*, 196 W.Va. 97, 468 S.E.2d 712 (1996); *Tolliver v. The Kroger Co.*, 201 W.Va. 509, 517, 498 S.E.2d 702, 710 (1997).

■ We also agree with the lower court that a document that may appear on its face to be free from ambiguity, may be deemed latently ambiguous. "A latent ambiguity, which does not appear upon the face of the document, however, may be created by intrinsic facts or extraneous evidence." *Kopf v. Lacey*, 208 W.Va. 302, 307, 540 S.E.2d 170, 175 (2000) (*per curiam*) (citing *Black's Law Dictionary* 794 (5th ed. 1979)). *See also, Snider v. Robinett*, 78 W.Va. 88, 88 S.E. 599 (1916) ("[when] evidence discloses a latent ambiguity, such, for instance as that there are two objects, to either of which the terms of the writing apply with equal fitness, then prior and contemporaneous transactions and collocutions of the parties are admissible for the purpose of identifying the particular object intended."); *Farmers and Merchants Bank v. Farmers and Merchants Bank*, 158 W.Va. 1012, 1017, 216 S.E.2d 769, 772 (1975) ("A latent ambiguity is one that is not apparent upon the face of the instrument alone and that is discovered when it is sought to identify the property, the beneficiaries, etc."); *Collins v. Treat*, 108 W.Va. 443, 446, 152 S.E.

---

13. *See*, Patrick C. McGinley, *Legal Problems Relating to Ownership of Gas Found in Coal Deposits*, 80 W. Va. L.Rev. 369 (1978).

14. Thus we are considering the case of a lessor who owned from the heavens to the center of the earth. *"Cujus est solum, ejus est usque ad coelum et ad inferos." See, Dolan v. Dolan*, 70 W.Va. 76, 73 S.E. 90; *Drummond v. White Oak Fuel*, 104 W.Va. 368, 140 S.E. 57 (1927).

already mined area that has collapsed as the supporting pillars were removed. This is called the "gob zone" and usually extends some distance beyond the original coal horizons. *See*, Jeff L. Lewin et al., *Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane*, 94 W. Va. L.Rev. 563 (1992).

205, 206 (1930) ("A latent ambiguity arises when the instrument upon its face appears to be clear and unambiguous, but there is some collateral matter which makes the meaning uncertain.").

■ Having determined that a document is ambiguous, a court must embark upon a search for the intent of the parties. With regard to a contract, the Court has explained:

> If an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent.

*Fraternal Order of Police, Lodge Number 69 v. City of Fairmont*, 196 W.Va. 97, 101 n. 7, 468 S.E.2d 712, 716 n. 7 (1996). In reference to a coal severance deed, this Court has explained: "It must be borne in mind in construing this paper [the coal severance deed] that the purpose of all construction is to give effect to the intention of the parties." *Rock House Fork Land Co. v. Raleigh Brick & Tile Co.*, 83 W.Va. 20, 22, 97 S.E. 684, 685 (1918).

■ With respect to the applicable time period, the Court has stated, with regard to deeds that "[a] deed will be interpreted and construed as of the date of its execution." Syl. pt. 2, *Oresta v. Romano Bros.*, 137 W.Va. 633, 73 S.E.2d 622 (1952); *accord*, syl. pt. 3, *Quintain v. Columbia Natural Resources*, 210 W.Va. 128, 556 S.E.2d 95 (2001). We find both of these principles applicable to the case at hand, and correctly applied by the lower court.

■ The lower court also found that the leases should be construed in favor of the appellees, who were the lessors, and against appellant Energy Development Corporation, the lessee. We concur. "The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee." Syl. pt. 1, *Martin v. Consolidated Coal & Oil Corp.*, 101 W.Va. 721, 133 S.E. 626 (1926). *See also, Jackson v. Kent*, 106 W.Va. 37, 46, 145 S.E. 572, 575 (1928) ("[L]eases for oil and gas development should be construed most strongly against the lessee rather than the lessor."); *accord, Charlton v. Chevrolet Motor Co.*, 115 W.Va. 25, 174 S.E. 570 (1934); *Moore v. Johnson Serv. Co.*, 158 W.Va. 808, 219 S.E.2d 315 (1975); *United Fuel Gas Company v. Cabot*, 96 W.Va. 387, 122 S.E. 922 (1924); *Eclipse Oil Company v. South Penn Oil Company*, 47 W.Va. 84, 34 S.E. 923 (1899).

■ The lower court emphasized the fact that Energy Development Corporation solicited and prepared the leases. While the sophistication of at least some of the lessors in this case may have been greater than average, this Court has noted that a lessor may often be at an informational or technical disadvantage, and must often rely upon the advice of the lessee or his or her agent:

> [T]hose engaged in the production of oil send agents armed with printed leases to solicit leases, and they take leases for great areas, and they are forms already prepared, and the people in many instances know little of them, are inexperienced in oil operations, and are without legal advice. They rely on the agent.

*Bettman v. Harness*, 42 W.Va. 433, 448, 26 S.E. 271, 276 (1896); *accord, Moody v. Smoot Advertising Co.*, 98 W.Va. 261, 267, 126 S.E. 919, 921 (1925). Although this quotation discusses oil leases, we believe this to be equally true in the gas business or coal business. The court also noted that counsel for Energy Development Corporation had the final say in the wording of the leases. As this Court noted in *Moody*, concerning the lease of a building:

> The writing was prepared by the lessee through its representative and attorney, and should therefore be construed against it in favor of the lessor. "It is well settled in West Virginia, where a lease is prepared by the lessee, and there is doubt as to its construction, it must be construed against the lessee *as the party who selected the terms and expressions used.*"

*Moody v. Smoot Advertising Co.*, 98 W.Va. 261, 267, 126 S.E. 919, 920 (1925) (emphasis in original) (quoting *Bettman v. Harness*, 42 W.Va. 433, 26 S.E. 271 (1896)). We believe that the decision of the lower court to construe the leases in favor of the appellees and against Energy Development Corporation is in accord with this longstanding authority.

 The circuit court also determined that it could examine the custom and usage of the gas industry at the time the leases were executed in its search for the parties' intent. This, too, is a principle of long standing: "Oral testimony of the general usages of the gas business, which must have been in the minds of the parties at the time of entering into the contract, is admissible to explain an ambiguity in a written contract for the purchase of gas, whether the ambiguity be latent or patent." Syl. pt. 2, *Bell v. Wayne United Gas Co.*, 116 W.Va. 280, 181 S.E. 609 (1935); *accord, Cotiga Development Company v. United Fuel Gas Company*, 147 W.Va. 484, 128 S.E.2d 626 (1962).

 Two other issues shed light on the intention of the parties and helped persuade the lower court that the appellees did not intend to convey a right to develop the coalbed methane in the leases: First, if the leases included the right to develop coalbed methane, then they would also carry an implied right for Energy Development Corporation to invade the coal seams of the appellees and stimulate them in a fashion that could make it more difficult or dangerous to later produce the coal; second, that the production of coalbed methane was not a common practice in McDowell County at the time the leases were executed. When considering

a deed that conveyed an interest in coal, this Court found:

> [W]here implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed.

*Buffalo Mining Co. v. Martin*, 165 W.Va. 10, 18, 267 S.E.2d 721, 725 (1980).[15] Although these cases concerned rights under coal deeds, and not an oil and gas lease, we believe the same logic applies. When an agreement is ambiguous, a court is loath to adopt a construction that places a large and possibly never-considered burden on one of the parties; generally, a court will not find an implied right to conduct a given activity (not mentioned in the lease) unless that activity is clearly demonstrated to have been a common practice in the area, at the time of the lease's execution:[16]

> In order for a usage or custom to affect the meaning of a contract in writing because [it was] within the contemplation of the parties thereto, it must be shown that the usage or custom was one generally followed at the time and place of the contract's execution.

Syl. pt. 1, *West Virginia–Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 42 S.E.2d 46 (1947); syl. pt. 1, *Lowe v. Guyan Eagle Coals, Inc.*, 166 W.Va. 265, 273 S.E.2d 91 (1980); *Phillips v. Fox*, 193 W.Va. 657, 663, 458 S.E.2d 327, 333 (1995).[17]

---

**15.** Or, as the Court stated in a case considering whether the right "to remove all said coal" implied a right to destroy the surface via strip mining: Certainly if the owner of the surface has a proprietary right to subjacent support, he has at least an equal right to hold intact the thing to be supported, *i.e.*, the surface, in the absence of a clearly expressed intention to the contrary. *West Virginia–Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 837, 42 S.E.2d 46, 50 (1947).

**16.** *See, e.g., Cogar v. Sommerville*, 180 W.Va. 714, 719, 379 S.E.2d 764, 769 (1989) ("It would be impossible to conceive that the parties to old severance deeds would have any contemplation of waiving future statutory rights."); *accord, Ant-*

*co, Inc. v. Dodge Fuel Corp.*, 209 W.Va. 644, 652, 550 S.E.2d 622, 630 (2001).

**17.** In another illustration of the importance this Court has placed upon the intent of the parties, this Court has found that a deed conveying "all the coal and other minerals of every kind and description, except gas and oil in and underlying said land" did not convey any interest in a seam of clay valuable for brick-making purposes. After examining the deed in its entirety and finding the deed only made reference to standard mining techniques using tunneling, the court held: "[T]he meaning of the words used in the grant, when construed in the light of this language used in granting the mining rights, are limited to such

As we have observed, the lower court made findings of fact that Energy Development Corporation solicited the leases and had its counsel prepare them, that any right to develop coalbed methane would include an implied right to invade the appellees' coal seams, that representatives of Energy Development Corporation may have been aware of the value of coalbed methane but that the appellees were not, and that no coalbed methane wells had been drilled in the area as of 1986. In light of the foregoing authority, we find that the lower court did not err in finding the leases ambiguous, in construing them against Energy Development Corporation, the lessee, and in considering the custom and usages of the gas industry in McDowell County in 1986.

With due consideration to the foregoing authority, we hold that, in the absence of specific language to the contrary or other indicia of the parties' intent, an oil and gas lease does not give the oil and gas lessee the right to drill into the lessor's coal seams to produce coalbed methane gas.[18] We express no opinion as to what result may obtain in a different factual scenario, as such a question is not before the Court at this time.

### C. Other Courts

Other states have grappled with conflicts between various owners as to who has the right to develop coalbed methane.[19] Perhaps

the best indicator that this is a complex and elusive issue, not lending itself to simple solutions, is the fact that the decisions in this area are all over the map. "Struggling to articulate clear rules for the resolution of this difficult issue, the courts, especially when these cases are considered together, displayed confusing and inconsistent reasoning." *Newman v. RAG Wyoming Land Company,* 2002 WY 132, 53 P.3d 540, 548 (2002).[20] However, we believe that, while the decisions do differ in many regards, the greatest common factor among these decisions is a consideration for the intent of the parties, with emphasis on the state of affairs at the time of the grant, lease, or conveyance.[21]

One of the earliest modern cases is *United States Steel Corp. v. Hoge,* 503 Pa. 140, 468 A.2d 1380 (1983), which considered a dispute between successors in interest to the original fee owners (and their gas lessee) and a coal owner. In 1920, the original fee owners had sold "[a]ll the coal of the Pittsburgh or River Vein" to U.S. Steel and reserved the "rights to drill and operate through said coal for oil and gas without being held liable for any damages." *Id.* 503 Pa. at 144, 468 A.2d at 1382. In 1978, the successors in interest to the original owners leased the gas to a third party who began drilling test wells and making plans to develop the coalbed methane by

minerals as are secured by the ordinary processes of mining." *Rock House Fork Land Co. v. Raleigh Brick & Tile Co.,* 83 W.Va. 20, 25, 97 S.E. 684, 686 (1918).

18. However, such "other indicia" of the parties' intent should be viewed in accordance with the longstanding principles of construction we have discussed in this opinion, including the notion that an instrument should be construed as of the date of its execution, and in light of the customs and usages then prevalent.

19. For a good overview of many of the cases, see, Michelle D. Baldwin, *Ownership of Coalbed Methane Gas: Recent Developments in Case Law,* 100 W. Va. L.Rev. 673 (1998).

20. A leading article on this topic has attempted to make sense of several plausible ownership theories by listing each, (*e.g.* "1. CBM is coal, 2. CBM is gas, etc.") and discussing the strengths and weaknesses of each approach. As the article explains, "[t]he conflicting legal principles and

the existing precedent ... do not point toward any one of these solutions as necessarily or even probably correct, so a court could adopt any one of the approaches described below and not be 'wrong' in any objective sense." Jeff L. Lewin et al., *Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane,* 94 W. Va. L.Rev. 563, 614 (1992).

21. One commentator has said:

Despite discrepancies in their analyses and results, the courts share a common objective, namely, the determination of the intent of the parties to the conveyance of the particular property interest at issue.... [A] court's decision as to that intent will, many times, turn on what it perceives to be the plain meaning of the language employed, the application of a rule of construction, or the application of a rule of law or statute established in the relevant jurisdiction.

Rocky Mountain Mineral Law Foundation, *American Law of Mining* § 84.05 (2003).

"hydro fracturing" the coal seams.[22] The Supreme Court of Pennsylvania held that the coal owner, U.S. Steel, had title to the coal strata, which included any coalbed methane found within it.

At the center of this decision was the basic theory of mineral ownership in Pennsylvania, coupled with a concern that the proposed method of production would probably damage the coal seam and increase the danger for miners. Consistent with the "ownership in place" theory that applies in Pennsylvania, the court ruled:

> [S]uch gas as is present in coal must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control. The landowner, of course, has title to the property surrounding the coal, and owns such of the coalbed gas as migrates into the surrounding property.

*Id.* 503 Pa. at 147, 468 A.2d at 1383 (emphasis in original). However, in West Virginia, we follow the "rule of capture" for oil and gas. This Court has stated:

> West Virginia recognizes the venerable common law doctrine of capture: [Oil and gas] belong to the owner of the land, and are part of it, so long as they are on it or in it subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.

*Powers v. Union Drilling, Inc.,* 194 W.Va. 782, 787, 461 S.E.2d 844, 849 (1995) *quoting, Trent v. Energy Development Corp.,* 902 F.2d 1143 (4th Cir.1990) (citation and internal quotations omitted). That difference between our states duly noted, we believe the important fact about *Hoge* is not so much our different theories of ownership, but that the court found that a limited reservation of a right to drill *through* the coal did not include the right to drill *into* the coal and develop the coalbed methane. Focusing on the intent of the parties, the court stated:

> The reservation to the grantor of the right to drill through the coal seam deeded away for oil and gas is stated generally. Although the unrestricted term "gas" was used in the reservation clause, in light of the conditions existing at the time of its execution we find it inconceivable that the parties intended a reservation of all types of gas.... We find more logical and reasonable the interpretation offered by the Appellant [coal owner] that the reservation intended only a right to drill through the seam to reach the unconveyed oil and natural gas generally found in strata deeper than the coal.

*Id.* 503 Pa. at 149–50, 468 A.2d at 1384–85. Thus the intention of the parties was a paramount concern, giving consideration to common usage and practice at the time of the conveyance.

The Supreme Court of Alabama has also considered this issue. In *NCNB Texas National Bank, N.A. v. West,* 631 So.2d 212 (Ala.1993), the Alabama Court also considered the difference between the rule of capture (which it described as a "nonownership theory") and the concept of ownership in place in a dispute between a coal owner and the successor in interest to the original fee owner. The original owner had severed the coal and coal mining rights in a 1954 deed conveying "all the coal," but reserving "all the oil, gas, petroleum and sulphur." In a detailed and complex holding, the court ruled that the coal owner "owned" the coalbed methane when it was still in the coal, and the gas owner "owned" it when it migrated out of the coal strata:

> We hold that the appellant gas owners have no interest in coalbed gas recovered from horizontal or vertical wells drilled directly into coalbeds before the coal is mined, although the gas owners do have a 22½% interest in coalbed gas that migrates out of the coal seams, such as that gas collected within the gob zone.

---

**22.** In hydro fracturing or "fracing" a gas operator injects water or other substances into the coal seam to create fracture through which the gas may be released into the well bore. *See Hoge, supra.*

*Id.*, 631 So.2d at 229. Without reaching the same sweeping conclusions of the Alabama Court, we feel that its decision is notable in that it focused upon the intent of the original grantors at the time they conveyed away the coal.

The U.S. Supreme Court has also recently considered a coalbed methane case in *Amoco Production Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 119 S.Ct. 1719, 144 L.Ed.2d 22 (1999). The Southern Ute Tribe ceded certain lands to the federal government in 1880. In the early 1900's, much of this land was distributed by the federal government to homesteaders as land grants. Because of an early 20th Century coal shortage in the western United States, Congress enacted new land grant legislation in 1909 and 1910. The 1909 and 1910 laws, unlike earlier legislation, did not grant the land in fee simple absolute, but instead included "a reservation to the United Stated of all coal in said lands, and the right to prospect for, mine, and remove the same." *Id.* 526 U.S. at 869–70, 119 S.Ct. at 1722–23, 144 L.Ed.2d at 27–28.

In 1938, the federal government returned, in trust, some of the traditional Ute lands to the Tribe, "including the reserved coal in lands patented under the 1909 and 1910 Acts. As a result, the Tribe now has equitable title to the coal in lands within its reservation settled by homesteaders under the 1909 and 1910 Acts." *Id.*, 526 U.S. at 870, 119 S.Ct. at 1723, 144 L.Ed.2d at 27–28. In 1991, the Ute Tribe filed suit against Amoco, who held a gas lease from the successors in interest to the original homesteaders, claiming that the coalbed methane had been reserved along with the coal, so that the Tribe now owned the coalbed methane.

The Court focused its inquiry upon the intent of the Congress in passing the 1909 and 1910 acts, finding that, "[i]t is evident that Congress viewed CBM gas not as part of the solid fuel resource it was attempting to conserve and manage but as a dangerous waste product, which escaped from coal as the coal was mined." *Id.*, 526 U.S. at 875, 119 S.Ct. at 1725, 144 L.Ed.2d at 31. Ultimately the Court concluded that the coalbed methane did not belong to the Ute Tribe, who owed the coal, but rather to the successors in interest to the original homesteaders. The Court largely based its decision on the limited nature of the reservation made by Congress:

> When it enacted the 1909 and 1910 Acts, Congress did not reserve all minerals or energy resources in the lands. It reserved only coal, and then only in lands that were specifically identified as valuable for coal. It chose not to reserve oil, natural gas, or any other known or potential energy resources.
>
> The limited nature of the 1909 and 1910 Act reservations is confirmed by subsequent congressional enactments.[23]

*Id.*, 526 U.S. at 877, 119 S.Ct. at 1726, 144 L.Ed.2d at 32. Thus, one might argue that the *Amoco* Court took the view that, when one makes a reservation of rights, one only gets what one named explicitly and specifically in the reservation.

---

**23.** The Court continued:

When Congress wanted to reserve gas rights that might yield valuable fuel, it did so in explicit terms. In 1912, for example, Congress enacted a statute that reserved "oil and gas" in Utah lands. Act of Aug. 24, 1912, 37 Stat. 496. In addition, both the 1912 Act and a later Act passed in 1914 continued the tradition begun in the 1909 and 1910 Acts of reserving only those minerals enumerated in the statute. See *ibid.;* Act of July 17, 1914, 38 Stat. 509, as amended, 30 U.S.C. §§ 121–123 (providing that "[l]ands withdrawn or classified as phosphate, nitrate, potash, oil, gas, or asphaltic minerals, or which are valuable for those deposits," could be patented, subject to a reservation to the United States of "the deposits on account of which the lands so patented were withdrawn or classified or reported as valuable"). It was not until 1916 that Congress passed a public lands Act containing a general reservation of valuable minerals in the lands. See Stock–Raising Homestead Act, ch. 9, 39 Stat. 862, as amended, 43 U.S.C. § 299 (reserving "all the coal and other minerals in the lands" in all lands patented under the Act). See also *Western Nuclear*, 462 U.S., at 49, 103 S.Ct. 2218, 76 L.Ed.2d 400 ("Unlike the preceding statutes containing mineral reservations, the [1916 Stock–Raising Homestead Act] was not limited to lands classified as mineral in character, and it did not reserve only specifically identified minerals").

*Id.*, 526 U.S. at 877–78, 119 S.Ct. at 1726, 144 L.Ed.2d at 32.

The *Amoco* Court also considered the traditional right of the coal owner or operator to vent gas:

> It may be true, nonetheless, that the right to mine the coal implies the right to release gas incident to coal mining where it is necessary and reasonable to do so. *The right to dissipate the CBM gas where reasonable and necessary to mine the coal does not, however, imply the ownership of the gas in the first instance.* Rather, it simply reflects the established common-law right of the owner of one mineral estate to use, and even damage, a neighboring estate as necessary and reasonable to the extraction of his own minerals.

*Id.*, 526 U.S. at 879, 119 S.Ct. at 1727, 144 L.Ed.2d at 33 (emphasis added). The appellant argues that the decision in *Amoco* is dispositive on the issue of coalbed methane ownership in West Virginia. Appellant claims that, because the *Amoco* Court found that Congress's reservation of coal did not include coalbed methane, and found that the right to vent does not *ipso facto* amount to ownership, that coalbed methane is conclusively "a gas" and thus passed under the "all gas" language of the 1986 leases.

While seductively simple, this logic does not persuade us. We believe that what the Court determined was that a *limited* reservation (recall that Congress had previously made these land grants in fee simple absolute) reserved only that which was specifically and explicitly mentioned. Moreover, the Court in *Amoco* concerned itself primarily with the *intent* of the Congress and what it would have understood about the industry at the time of the enactments. Just as in the instant case, the focus was on what a party, at the time of the conveyance, would have intended to pass, or not pass, in the conveyance. Thus, we conclude that *Amoco* is not at odds with our holding in this case, and does not require a blanket finding by this Court that coalbed methane "is gas."

In a dispute between a coal operator and gas owner, the Wyoming Supreme Court determined that a deed that conveyed "all coal and minerals commingled with coal," but reserved to the grantor "all oil, gas and other minerals," did not convey the coalbed meth-

ane to the coal owner, but, instead, reserved it for the grantor. In a decision at odds with the Pennsylvania case of *Hoge*, but consistent with U.S. Supreme Court in *Amoco*, the Wyoming court focused on the intent of the parties:

> To conclude that the landowners intended to separate the coalbed methane and convey it along with their outstanding royalty interest through the language of "all coal and minerals commingled with [the] coal" is simply not plausible. . . .

*Newman v. RAG Wyoming Land Company,* 2002 WY 132, 53 P.3d 540, 549 (2002). The court went on to hold:

> On the basis of the unambiguous language of the deed and the surrounding facts and circumstances, we conclude the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property.

*Id.*, 53 P.3d at 550. Again, although this decision ultimately favored the gas owner, the court considered the intent of the parties at the time of the conveyance and found that it was unlikely that the party making a specific conveyance of one mineral, the coal, would have silently included another interest, the coalbed methane. Thus, we feel that the underlying logic of the Wyoming case is not entirely inconsistent with our view.

The Montana Supreme Court reached a similar conclusion that the conveyance of "all coal and coal rights" did not include coalbed methane. In *Carbon County v. Union Reserve Coal Co., Inc.,* 271 Mont. 459, 898 P.2d 680 (1995), the Montana Court considered a dispute between the county and its gas lessee on one side, and the coal owner on the other. The deed in question had conveyed "all coal and coal rights" but was silent as to gas. The county later granted a lease to a gas operator that specifically included the right to develop coalbed methane. When the gas operator started to drill wells into the coal, the coal owner objected, and the county filed suit to quiet title to the coalbed methane.

After concluding that "methane gas is not a constituent part of coal," *id.*, 271 Mont. at

471, 898 P.2d at 687, the Montana Court held that the county had not conveyed the coalbed methane to the coal owner:

> [W]e hold that as the lessee of Carbon County, the owners of the gas estate, Florentine [the gas developer] has the right to drill for and to produce the coal seam methane gas at issue here. We also hold that Union Reserve [the coal operator] has a mutual, simultaneous right to extract and to capture such gas for safety purposes, incident to its actual coal mining operations [24]

*Id.,* 271 Mont. at 474, 898 P.2d at 689. Again, this decision turned upon the intent of the original owner at the time of making a specific and limited conveyance of the coal. While we are considering a lease, and not a deed, and while we are not making any sweeping statements regarding the "true nature" of coalbed methane, that underlying logic of the Montana Court is not inconsistent with our holding.

Finally, we note that the Supreme Court of our neighboring state of Virginia has before it a similar dispute in *Ratliff, et al. v. Harrison–Wyatt, LLC, et al.,* Case No. 187–00 (29th Va. Cir.Ct.2002), which as of the writing of this opinion, has not yet been decided. Understanding that the Virginia Supreme Court will have the final word on the matter, we still find an examination of the Virginia case valuable. The lower court in *Ratliff* considered a dispute between a coal owner and the successors in interest to the original surface/fee owner who had conveyed by deed in 1873 and 1877 "all coal and reasonable surface and underground use of the property in connection with mining the coal."

As we have done in the instant case, the Virginia Court in *Ratliff* considered "what the language meant to the parties at the time of conveyance" .. and "examin[ed] the terms used in light of the common understandings, along with other facts and circumstances during the time period." *Id.* It is notable that the court, as we have, resisted the temptation to declare coalbed methane to be ei-

ther "coal" or "gas." The *Ratliff* court stated: "[T]he only finding that would allow the Court to rule in favor of the coal owners is that the CBM is a constituent of the coal itself. The Court cannot make such a finding." *Id.* The Virginia Court concluded by making the following specific holdings:

> The Court cannot find that the CBM implicitly passed to the coal owners by virtue of the grant of the coal estate. To rule otherwise would, contrary to Virginia law, have the effect of requiring the grantor to have expressly reserved the rights to every resource contained within the coal seam that it did not intend to grant along with the coal.

> The Court now holds that the surface owners' right to the CBM only extends to that which has separated from the coal. The Court does not hold that the surface owners have the right to frac the coal in order to retrieve the CBM

> The Court holds that a grant of coal rights does not include title to the CBM absent an express grant of CBM, natural gases, or minerals in general; and that the surface owner holds right to the CBM once it has separated from the coal.

*Ratliff, et al. v. Harrison–Wyatt, LLC, et al.,* Case No. 187–00 (29th Va. Cir.Ct.2002).

We find no fault with the Virginia decision, though it may be reversed on appeal. The basic premise of that decision, that one making a grant of one interest need not specifically reserve every other possible interest, is in harmony with West Virginia law; the court's focus of inquiry, the intent of the parties, is precisely the same as ours. We believe the underlying, intent-focused rationale of Virginia holding is consistent with our view in the instant case.

### D. The Statute

The Legislature, aware as we have noted of both the dangerousness and value of coalbed methane, has crafted an elaborate statutory scheme in an attempt to balance the conflicting goals of guarding against

---

24. The court continued by saying:
> We leave to the agreement of the parties or to some future case the issue of whether, and if so, to what extent, the gas estate owner or

> lessee is entitled to be compensated by the coal owner for gas extracted and captured incident to the coal owner's mining operations.
> *Id.*

coalbed methane's dangerous qualities, while taking advantage of its substantial economic value.[25] Though we come to it last, it is of great importance. The statute creates a mechanism whereby those who wish to produce coalbed methane may request the "unitization" of a given area and apply for a permit. As part of the permitting process, the operators first describe the general area where they intend to produce the coalbed methane. With the cooperation of the Coalbed Methane Review Board, a plan for the area is produced, with the overall area often called a "field," and the smaller area that will be occupied by a well or wells called a drilling unit.[26]

Once these areas are defined, the operators must then contact all the parties that might have an interest in the coalbed methane.

(a) Prior to filing an application for a permit for a coalbed methane well under this article, the applicant shall deliver by personal service or by certified mail, return receipt requested, copies of the application, well plat and erosion and sediment control plan to the following:

(1) The owners of record of the surface of the tract on which the coalbed methane well is to be located;

(2) The owners of record of the surface of any tract which is to be utilized for roads or other land disturbance;

(3) Each coal owner and each coal operator (i) from whom a consent and agree-

---

**25.** It is written from a perspective that reflects the longstanding dominance of the coal industry of this state:

(a) The Legislature hereby declares and finds that the venting of coalbed methane from mine areas and degasification of coal seams has been and continues to be approved by the state for the purpose of ensuring the safe recovery of coal; that the value of coal is far greater than the value of coalbed methane and any development of the coalbed methane should be undertaken in such a way as to protect and preserve coal for future safe mining and maximum recovery of the coal; that subject to the above declarations and findings, commercial recovery and marketing of coalbed methane should in some cases be facilitated because the energy needs of this state and the United States indicate that the fullest practical recovery of both coal and coalbed methane should be encouraged; that the Energy Policy Act of 1992 was enacted in part to encourage coalbed methane development and the state of West Virginia should enact legislation which carries out the purposes of said act; that in order to encourage and ensure the fullest practical recovery of coal and coalbed methane in this state and to further ensure the safe recovery of both natural resources, it is in the public interest to enact this article authorizing coalbed methane well permits, regulating the design of coalbed methane wells and recovery techniques, authorizing coalbed methane well units and pooling of interests therein to provide all coalbed methane operators and coalbed methane owners with an opportunity to recover their just and equitable share of production.

W. Va.Code § 22–21–1(a) (1994).

**26.** (a) In the absence of a voluntary agreement, an operator, owner or other party claiming an ownership interest in the coalbed methane may file an application with the chief to pool (i) separately owned interests in a single tract, (ii) separately owned tracts, (iii) separately owned interests in any tract, and (iv) any combination of (i), (ii) and (iii) to form a drilling unit for the production of coalbed methane from one or more coalbed methane wells.

(b) The application for a drilling unit may accompany the application for a permit for a coalbed methane well or be filed as a supplement to the permit application. Such application shall be verified by the applicant and contain the following information for the proposed unit:

(1) The identity of each well and operator as set out in the well permit application;

(2) Each well number, if one has been assigned;

(3) The acreage of the proposed unit, the identity and acreage of each separate tract to be included in the proposed unit, and, where parts of tracts are included, the acreage of such parts;

(4) The district and county in which the unit is located;

(5) The names and addresses of the owners of the coal and coalbed methane underlying each separate tract, or the portion thereof which is to be included in the unit, any lessees or operators thereof, any coalbed methane owners not otherwise named, and any other claimants thereto known to the applicant. When any coal seam is separately owned, the list of names shall identify such separate ownership giving the names of the separately owned seams;

(6) A statement describing the actions taken by the applicant to obtain a voluntary agreement from each interest owner or claimant named in the application from which agreement has not been obtained;

(7) Other pertinent and relevant information as the chief may prescribe by rules.

W. Va.Code § 22–21–15 (1994).

ment provided for in section seven of this article is required, or (ii) whose coal seam will be penetrated by the proposed coalbed methane well or is within seven hundred fifty feet of any portion of the well bore; and

(4) Each owner and lessee of record and each operator of natural gas surrounding the well bore and existing in formations above the top of the uppermost member of the "Onondaga Group" or at a depth less than six thousand feet, whichever is shallower. Notices to gas operators shall be sufficient if served upon the agent of record with the office of oil and gas.

W. Va.Code § 22–21–9 (1994). We find it noteworthy that the statute requires notice to all parties who might have some interest in the coalbed methane: surface owners, coal owners, coal operators, and the owners, lessees, and operators of oil and gas wells. Also worthy of note is the way the statute completely avoids and eschews any attempt at deciding ownership of coalbed methane. The statute provides in part:

> The review board shall take evidence, making a record thereof, and *consider:* ...
>
> (6) The nature and extent of ownership of each coalbed methane owner or claimant and whether conflicting claims exist;
>
> (7) Whether the applicant for the drilling unit proposes to be the operator of the coalbed methane well or wells within the unit; and if so, whether such applicant has a lease or other agreement from the owners or claimants of a majority interest in the proposed drilling unit;
>
> (8) Whether a disagreement exists among the coalbed methane owners or claimants over the designation of the operator for any coalbed methane wells within the unit, and if so, relevant evidence to determine which operator can properly and efficiently develop the coalbed methane within the unit for the benefit of the majority of the coalbed methane owners;

W. Va.Code § 22–21–17 (1994) (emphasis added). After considering these issues, the review board issues an order, either granting or denying the pooling request, and giving anyone with a claim to the coalbed methane several options:

> (e) Upon issuance of the pooling order, the coalbed methane owners or any lessee of any such owners or any claimants thereto may make one of the following elections within thirty days after issuance of the order:
>
> (1) An election to sell or lease its interest to the operator on such terms as the parties may agree, or if unable to agree, upon such terms as are set forth by the board in its order;
>
> (2) An election to become a working interest owner by participating in the risk and cost of the well; or
>
> (3) An election to participate in the operation of the well as a carried interest owner.
>
> Any entity which does not make an election within said thirty days prescribed herein shall be deemed to have elected to sell or lease under election (1) above.

W. Va.Code § 22–21–17 (1994). Presuming that all those who think they have an interest in the coalbed methane agree, the review board then issues and order establishing how to distribute the profits. In the case of a conflict, any profits from production go into an escrow account:

> (j) After each coalbed methane owner has made, or has been deemed to have made, an election under subsection (e) of this section, the review board shall enter a division order which shall set out the net revenue interest of each working interest owner, including each carried interest owner and the royalty interest of each coalbed methane owner. Thereafter payments shall be made to working interest owners, carried interest owners and royalty interest owners in accordance with the division order, except that payments attributable to conflicting claims shall be deposited in the escrow account. The fractional interest of each owner shall be expressed as a decimal carried to the sixth place.

W. Va.Code § 22–21–17 (1994).

However, the statute offers little guidance on what to do in the event that potential claimants are unable to work out a solution on their own:

(k) Upon resolution of conflicting claims either by voluntary agreement of the parties *or a final judicial determination,* the review board shall enter a revised division order in accordance with such agreement or determination and all amounts in escrow shall be distributed as follows:

W. Va.Code § 22–21–17 (1994) (emphasis added).[27] This reference to a "final judicial determination" shows that the Legislature was reluctant, as are we, to make a sweeping pronouncement about the general ownership of all coalbed methane. Instead, as evidenced by the entire statute, the Legislature chose a path that would resolve conflicts on a case-by-case basis, encourage cooperation among potential claimants, and foster the safe production of coalbed methane, while protecting the safety of miners and the economic value of the coal.

We do not feel that our decision in this case is at odds with the statute, or adverse to the public policy goals expressed by the Legislature, nor does it prevent conventional gas lessees in this state from participating in the production of coalbed methane. A gas lessee, like Energy Development Corporation, holding a conventional gas lease need only obtain the express right to produce coalbed methane from the lessor, or other party deemed to have ownership of the coalbed methane. As the statute suggests, in those cases where there is still a dispute over ownership, the parties may seek "resolution of conflicting claims ... by voluntary agreement or a final judicial determination." In most cases, disputes among multiple parties claiming the right to develop coalbed methane can be resolved via the application of the West Virginia Coalbed Methane Act, W. Va. Code § 22–21–1, *et seq.* (1994), and cooperation among the parties.

---

27. The section continues:
 (1) Each legally entitled working interest owner shall receive its proportionate share of the proceeds attributable to the conflicting ownership interests;
 (2) Each legally entitled carried interest owner shall receive its proportionate share of the proceeds attributable to the conflicting ownership interests, after recoupment of amounts provided in subsection (h) of this section;

## IV.

## CONCLUSION

For the reasons stated, the order of the Circuit Court of McDowell County is affirmed.

Affirmed.

Chief Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice ALBRIGHT dissents and reserves the right to file a dissenting opinion.

ALBRIGHT, Justice, dissenting.

(Filed Jan. 8, 2003)

The *ultimate* question presented to this Court by the case before us requires an identification of who acquires the right to drill a coalbed methane gas well under the statutory scheme adopted in 1994 and set forth in Article 21, Chapter 22 of the Code of West Virginia of 1931, as amended. The *immediate* question posed to the Court, however, is whether, under leases executed in 1986, a lessor of "all of the oil and gas and all of the constituents of either" in and underlying certain tracts of land, acquired the right to explore for, extract and market coalbed methane gas from those tracts.

The majority answers the immediate question by skillfully: (1) finding ambiguity in the leases, (2) avoiding the determination of whether coalbed methane is "gas" within the meaning of the leases, and (3) proceeding to construe the leases in a manner that prevents the lessee from applying for a permit to explore for and produce coalbed methane. Moreover, the majority simply ignores the ultimate question of identifying the party or parties who may be entitled to drill a coalbed

---

 (3) Each legally entitled entity leasing, or deemed to have leased, its coalbed methane shall receive a share of the royalty proceeds attributable to the conflicting interests; and
 (4) The operator shall receive the costs contributed to the escrow account by each legally entitled participating working interest owner.
W. Va.Code § 22–21–17(k).

methane well. I respectfully suggest that the majority erred on the three points and by failing to address the ultimate issue.

We have consistently held that, in the absence of an ambiguity, a lease or other instrument may not be construed by the courts but must be applied according to its clear terms. *Cabot Oil & Gas Corp. v. Pocahontas Land Corp.*, 180 W.Va. 200, 376 S.E.2d 94 (1988). This Court has also consistently defined ambiguity as follows:

Ambiguity in a statute or other instrument consists of susceptibility of two or more meanings and uncertainty as to which was intended. Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty.

*HN Corp. v. Cyprus Kanawha Corp.*, 195 W.Va. 289, 294, 465 S.E.2d 391, 396 (1995) (quoting Syl. Pt. 13, *State v. Harden*, 62 W.Va. 313, 58 S.E. 715 (1907)).

Under our law an oil and gas lease grants first a contingent title—an inchoate right or mere license—to explore for oil and natural gas; if either is found, a right vests in the lessor to produce such minerals and, in turn, to take title to the oil or gas produced as personalty when either is actually extracted from the land. *See South Penn Oil Co. v. Haught*, 71 W.Va. 720, 78 S.E. 759 (1913); *McGraw Oil & Gas Co. v. Kennedy*, 65 W.Va. 595, 64 S.E. 1027 (1909); *Lowther Oil Co. v. Miller–Sibley Oil Co.*, 53 W.Va. 501, 44 S.E. 433 (1903).

At the time of the execution of the leases at issue here, "natural gas" had been defined as:

A gas issuing from the earth's crust through natural openings or bored wells and frequently accompanied by petroleum. It occurs especially in the Paleozoic rocks of the United States and is of industrial importance in more than a dozen States. When combustible it consists chiefly of methane . . . .

*Webster's New Intl. Dictionary* 1631 (2nd ed 1958).

The same dictionary notes that in popular usage the term "gas" includes "[a]ny combustible gaseous mixture used for illuminating or as a fuel; as, natural *gas*, coal *gas*, etc." and recites that a typical analysis of the composition of natural gas revealed the sample to be 92% methane, 3% hydrogen and 2% nitrogen. *See id.* at 1035–36 (defining "gas"). Under the Energy Policy Act of 1992, the United States Congress defined "coalbed methane gas" as "occluded natural gas produced (or which may be produced) from coalbeds and rock strata associated therewith." 42 U.S.C. § 13368(p)(2) (2000). In West Virginia's response to the Energy Policy Act of 1992, as one of the named "affected states" particularly addressed by that federal legislation, our legislature adopted a somewhat more expansive definition: " 'Coalbed methane' means gas which can be produced from a coal seam, the rock or other strata in communication with a coal seam, a mined-out area or a gob well." W.Va.Code § 22–21–2(c) (1994) (2002 Repl.Vol.). Finally, it is noted that the leases in question granted the lessee rights to explore for and exploit *all* of the oil and gas underlying the tracts of land covered by the leases.

The majority found an ambiguity in the grant of a lease of "all of the oil and gas and all of the constituents of either" where reasonable minds could not differ as to the true and intended meaning of that language. Moreover, it appears beyond cavil that coalbed methane is gas, that is natural gas. Each of the dictionary definitions clearly identify methane as the principal component of natural gas and both the federal and state definitions of "coalbed methane" describe it as a gas. Consequently, the majority erred in finding ambiguity and, in the larger picture, in failing to clearly define coalbed methane as a gas, as natural gas.

I turn now to a review of the impact of the decision of the majority to construe the leases at issue here, rather than to apply their clear language. The majority construed the leases in a manner that prevents the oil and gas lessees here from applying for a permit to explore for and produce coalbed methane and led to the corollary decision to ignore the ultimate question of who may apply for a permit to drill such a well. In setting forth its reasoning, the majority relied heavily on

the analysis employed by the trial court. In its opinion, the trial court relied upon factors I consider extraneous, such as the regulatory requirements for oil and gas wells drilled through workable coal seams, requiring such wells to be sealed throughout the length of their passage through workable coal seams, and the absence of coalbed methane wells throughout the long history of oil and gas exploration in this state. The trial court also cited the lack of experience of the oil and gas lessees in this case with coalbed methane exploration or production and the fixed state policy of encouraging the safe handling and dispersal of methane gas during mining operations, etc. The majority opinion continued this analytical theme throughout its fine discussion of the issues the majority deemed dispositive of the case. I do not challenge these points. I simply find them irrelevant to the question of whether an oil and gas lessee retains the right under our law to search for and, with the proper permit, produce methane gas from a mined or unmined coalbed. These factors, however important, are not determinative of whether the leases executed in 1986 conferred on the lessees rights to explore for and produce coalbed methane or who may drill a coalbed methane well under this state's statutory scheme for permitting such wells.

Why do I say this? First, I note that the regulatory requirements for sealing drill holes running through coal seams apply only to workable coal seams. For the purposes of applying those requirements, "coal seam" and "workable coal bed" are interchangeably defined by statute as "any seam of coal twenty inches or more in thickness, unless a seam of less thickness is being commercially worked, or can in the judgment of the department foreseeably [sic] be commercially worked and will require protection if wells are drilled through it." W.Va.Code § 22–6–1(e) (1994). In other words, for a coal seam of less than twenty inches thickness that is neither being worked nor considered by the

regulatory authorities as capable of being worked, the statutory and regulatory sealing requirements upon which the trial court and the majority relied are simply ·inapposite. The majority failed to consider that as a result of the limitation of the sealing requirements to workable coal seams, generally of twenty or more inches thickness, an oil and gas lessee always had the expectation and the right to explore for and capture gas— including methane—in, under and above any coal seam not considered workable. In other terms, the words in a lease granting the right to explore for and extract "all" oil and gas have always included the right to extract methane gas. The extraction of methane has not been limited by the terms of the lease; the extraction of methane has heretofore been limited only by the state's regulatory scheme for protecting coal miners and coal mining and the lack of technology for the commercially justified production of methane gas from coalbeds.

Secondly, without regard to coal seams, it is simply a fact that methane can be found in a variety of strata, near or far from coal seams, and there has never been any doubt that such gas may be found, captured and extracted under standard oil and gas leases such as the lease at issue in this case.[1]

Both the trial court and the majority ignore the historic ability of oil and gas lessees to explore for and capture methane under the circumstances here described and literally jump to the conclusion that coalbed methane found in workable or previously worked coal seams cannot fall within the ambit of an older, standard oil and gas lease that does not specifically mention coalbed methane. Put directly, a grant of the right to explore for and exploit "all of the oil and gas" under a tract does not mean merely a right to explore for and extract only *some* of that oil and gas; "all" means *all*. Accordingly, I particularly dissent from the ruling forth in

---

1. The majority's attempt to bolster its position by reference to *West Virginia–Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 42 S.E.2d 46 (1947), wherein this Court determined that a right to remove all coal did not entitle the coal owner to remove the coal by destroying the surface of the land is misplaced. Lessee in the case before us does not seek to essentially destroy the estate of the surface owner, as in *Strong*, but only to seek a permit for a coalbed methane well, not unlike other oil and gas wells.

syllabus point eight of the majority opinion.[2]

I suspect that a substantial factor in the majority's narrow decision in this case proceeds from a belief that the ruling protects surface owners, who, in the case before us, also retained ownership of the coal in and underlying their land, free and clear of any coal lease or deed severing ownership of the coal from ownership of the surface. I fear that in more instances than not the majority's position accomplishes the opposite effect: It may well freeze out of the permit process for drilling a coalbed methane well the economic interests of the very small landowners the majority intended its ruling to protect.

Consider this scenario. In 1900, landowners' predecessor in title gave a severance deed for all the coal in and underlying their land, which coal is now owned by A. In later years it was determined that the coal seem was only 30 inches thick at best and is too gaseous and of such low quality as to not justify efforts to extract the coal. In 1986, landowners gave B an ordinary oil and gas lease, reserving "the usual 1/8th" royalty. In 2004, A elects to grant to C the right to "drill into C's coal seam to produce coalbed methane gas" horizontally from adjoining coal lands owned by A, and gives the necessary written consent to C so that C can obtain a coalbed methane permit. Under the majority's ruling, the oil and gas lessee, B, has no standing to claim an ownership interest; landowners will get no royalty under their oil and gas lease; and such landowners will have a royal fight on their hands to get one dime from the production of coalbed methane "occluded" in the coal under their land. Their sole recourse is to litigate an assertion that the severed coal owner has no right to allow the extraction of the coalbed methane gas from the coal owner's coal.

On the other hand, had the majority preserved the oil and gas lessee's ability to search for and produce gas even from a coalbed, such a lessee would have been entitled to negotiate with the coal owner for its permission to "drill through the coal seams to produce coalbed methane gas," and, if successful, would be duty bound to pay lessor land and surface owners the agreed upon royalty had the well or wells proven productive. Alternatively, if the coalbed owner desired to extract and commercially market coalbed methane found in the coal seams, both the owner of unleased oil and gas and an owner-lessor of the oil and gas in place could then expect to share in the proceeds, at least to the extent of the usual royalty, if not more. In my view, the majority's opinion achieves the opposite result. It enhances the ability of holders of severed interests in minerals to grant methane rights on properties where the surface owner or the owner's lessee holds oil and gas rights. The reality is that the majority's ruling is not a victory for most small landowners in this state. Nor is it simply a defeat for active oil and gas operators under a current oil and gas lease. Rather, it is a huge victory for the owners of large tracts of coal who hold that coal by virtue of severance deeds made decades ago, often long before the economic potential of coalbed methane or, for that matter, the economic potential of natural gas generally had been recognized.[3] The majority erred in not definitively preserving the right of owners of oil and gas in place, under lease or not, to share in the fruits of the production of coalbed methane extracted from their lands by virtue of the ownership of oil and gas rights in the real property. It appears that the majority's failure to preserve those rights proceeded, at least in part, from the fact that the majority considered this case in a virtual vacuum, without thorough attention to its ramifications upon the system suggested by the Congress, and adopted by our Legislature with modifications, to encourage the production of coalbed methane gas from coal seams, nearby strata, mined-out areas and gob wells.

---

2. Syllabus point eight of the majority opinion states: "In the absence of specific language to the contrary or other indicia of the parties' intent, an oil and gas lease does not give the oil and gas lessee the right to drill into the lessor's coal seams to produce coalbed methane gas."

3. It is also worthy of note that, unlike a severance deed, which fixes for all time the separation of title to severed minerals from the title to the surface of the land, most, but not all, oil and gas leases expire after a fixed term of years, unless oil or gas production is actually occurring under the lease.

By adopting West Virginia Code § 22–21–1, *et seq.*, the Legislature established a system whereby the production of coalbed methane might be encouraged while also stringently safeguarding the safety and economic viability of coal mining and providing at least the framework for protecting the economic interests of all owners or potential owners of rights in any given source of coalbed methane. The majority's opinion effectively excludes from that process both the lessors and the lessees under most existing oil and gas leases, in favor of owners of coal in place, be they also owners of the surface or, as is the case in so many situations, simply the owners of a coalbed, the title to which was long ago severed from the ownership of the surface. A frequent result of the majority's limited analysis of the issues presented by this case may well be that landowners who are lessors or potential lessors of oil and gas rights in and under their lands will be excluded from the coalbed methane income stream because the title to the coal in and underlying their land has long since been severed from the ownership of the surface.

It is clear that the majority intended its decision to apply only to the narrow issue the majority addressed in its opinion: Whether the lease at issue contemplated that the lessee might explore for and extract coalbed methane gas from the leased premises. Accordingly, this Court retains some ability to further examine the ramifications of its ruling in future cases. If that opportunity arises, this Court should, as the majority did not, give careful consideration to the framework adopted by the Legislature in West Virginia Code § 22–21–1, *et seq.* for (1) encouraging the production of coalbed methane from workable coal seams, mined out areas and potential gob wells, (2) protecting as a first priority the safety of ongoing mining operations, and (3) providing a means of apportioning both the cost and profit from the production of coalbed methane among all the parties with legitimate claim to an economic interest in the coalbed methane.

To be sure, the process spelled out by the legislation is not without some uncertainty or even ambiguity.[4] However, the legislation clearly contemplates that methane is a gas to be explored for, captured and marketed by an "operator," under a permit issued by our state's oil and gas regulatory authorities. The legislation, enacted to remove coalbed methane wells in West Virginia from the direct regulatory control of the United States Secretary of the Interior under the national Energy Policy Act of 1992, closely mirrors the procedures established by that federal act for the authorization of coalbed methane wells in workable coal seams.

The state law contemplates that, with the permission of the owner of the workable or mined out coal seam involved, an "operator" may be permitted to drill and operate a coalbed methane well. It does not undertake to define who is the "owner" of the coalbed methane nor does the legislation specify who may or may not be an "operator" of such a coalbed methane well. However, the law does provide three separate, alternative means of allocating the cost and, in due course, the profit, from such an operation.

It appears that this comprehensive legislation was intended to broadly encourage the development of the coalbed methane resources of this state by providing that either the owner or the owner's lessee of the oil and gas in an underlying a tract of land, or the owner or the owner's assignee of a workable coal seam underlying a tract of land may become the "operator" of a coalbed methane gas well on such a tract. The legislation appears to also contemplate that the owner or lessor of such oil and gas would, in all events, be entitled to the payment of a royalty on the extraction of such gas, subject to the resolution by the owner of the working interest in the oil and gas and by the owner of the coalbed of the means by which, under the statute, the costs of drilling the well are to be recovered and the profits allocated. Of course, the legislation expressly provides that the owner of the coal must consent to the drilling of such a coalbed methane well.

**4.** Discussion in this opinion of the apparent effect or impact of various provisions of this complex legislation should not be construed as an expression of any opinion on legal issues that may arise in the future related to the operation, effect or use of the subject statute or rules promulgated under its authority.

Correspondingly, the legislation appears to contemplate that the owner of the coalbed in which methane may be found may elect to become the "operator" of a coalbed methane well, directly or by an assignee, again subject to the resolution by the owner of the working interest in the oil and gas and by the owner of the coal in place of the means by which, under the statute, the well costs and profits are to be allocated. I suggest that the owner of the coal in place holds an equal right to be an operator because, while the methane is in the coal ("occluded" in the words of the federal Energy Policy Act of 1992) it is a constituent part of the coal. The right to mine the coal has always been seen to include the right, indeed the duty, to disperse such methane in the interests of the safety of miners and mining operations. By failing to recognize and underscore the goals of the legislation to encourage in appropriate circumstances, the "fullest practical recovery of coal and coalbed methane," as set out among the statements of policy and purpose found in the coalbed methane well act in West Virginia Code § 22–21–1, the majority has set the our law on this subject upon an unduly restrictive course. Hopefully, this misguided result will be rectified at the first opportune moment, without lasting damage to the landowners whose rights to compensation for methane gas removed from their lands has been seriously eroded as the result of the majority decision.

I regret that the majority did not address the ultimate issue of who might be an "operator" under the coalbed methane well act and did not embrace the view that the lessees here, as well as the owners of the coal in place and all other parties having an interest in the land, could be an "operator" under the coalbed methane well act.

For the reasons assigned, I respectfully dissent.