**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1166**

---

K & D HOLDINGS, LLC,

       Plaintiff – Appellee,

    v.

EQUITRANS, L.P.; EQT PRODUCTION COMPANY,

       Defendants – Appellants,

    and

EQT CORP. a/k/a Equitrans, Inc.,

       Defendant.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.   John Preston Bailey, District Judge.  (5:13-cv-00152-JPB)

---

Argued:  December 9, 2015       Decided:  December 28, 2015

Amended:  February 8, 2016

---

Before NIEMEYER, DUNCAN, and AGEE, Circuit Judges.

---

Reversed and remanded with instructions by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

---

**ARGUED:** Nicolle Renee Snyder Bagnell, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellants.  Stephen A. Wickland,

Clarksburg, West Virginia, for Appellee.  **ON BRIEF:** Kevin C. Abbott, Lucas Liben, REED SMITH LLP, Pittsburgh, Pennsylvania; Michael W. Smith, R. Braxton Hill, IV, CHRISTIAN & BARTON LLP, Richmond, Virginia, for Appellants.

———————————

DUNCAN, Circuit Judge:

This appeal concerns an oil and gas lease (the "Lease") between Defendants-Appellants Equitrans, L.P., and EQT Production Co. (collectively, "EQT"),[1] as lessees, and Plaintiff-Appellee K & D Holdings, L.L.C. ("K & D"), as lessor. The district court concluded that the Lease was divisible into two separate segments--one for production and exploration, and one for gas storage and protection of gas storage--and found that the production and exploration segment of the Lease had terminated after the Lease's initial five-year term. On appeal, Appellants contend that the Lease is not divisible and that because they are actively engaged in one of the activities covered by the Lease--protection of stored gas--the entire Lease remains in effect.

For the reasons stated below, we conclude that the district court erred and, accordingly, we reverse and remand with instructions to enter judgment for EQT.

---

[1] K & D originally filed the complaint against EQT Corp., also known as Equitrans, Inc. The district court later granted the parties' Joint Motion for Substitution of Parties, dismissing EQT Corp. d/b/a Equitrans Inc. as a party to this civil action and substituting Equitrans, L.P., and EQT Production Co. as defendants. Because all prior proceedings in the civil action were binding on Equitrans, L.P., and EQT Production Co. as if they had been properly joined and served as defendants from the initial filing, "EQT" will be used to refer to the Defendants-Appellants both before and after the substitution.

I.

A.

On December 2, 1989, Henry H. Wallace and Sylvia L. Wallace executed an oil and gas lease with Equitrans, Inc., covering 180 acres of land in Tyler County, West Virginia (the "Premises").[2]  K & D is the successor-in-interest to the lessors, the Wallaces, and Equitrans, L.P., is the successor-in-interest to the lessee, Equitrans, Inc.  Equitrans, L.P., subleased to EQT Production Co. the rights to produce and sell gas from the "premises and subsurface formations that are not used for the storage of gas or protection of stored gas."  J.A. 254.[3]  Thus, the Lease now governs the relationship between K & D and EQT.

The Lease grants EQT the right to use the Premises to explore for and produce oil and gas, to store gas, and to protect stored gas.[4]  The term of the Lease is established in Article IV (the "Durational Provision"), which reads as follows:

---

[2] The Wallaces also entered into two other oil and gas leases with Equitrans, Inc.: a lease for 40 acres dated March 26, 1992, and one for 12 acres dated September 16, 1994. On December 22, 2014, during the course of this litigation, Equitrans, L.P., released and surrendered these leases.  Only the 1989 lease remains.

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[4] Under Article I of the Lease, the Lessor
(Continued)

4

To have and to hold the said land and privileges for the said purposes for and during a period of 5 years from December 2, 1989, and as long after commencement of operations as said land, or any portion thereof or any other land pooled or unitized therewith as hereinafter provided, is operated for the exploration or production of gas or oil, or as gas or oil is found in paying quantities thereon or stored thereunder, or as long as said land is used for the storage of gas or the protection of gas storage on lands in the general vicinity of said land. It is understood that a well need not be drilled on the leased premises to permit the storage of gas thereunder and the Lessee shall be the sole judge of when and if said land is being used for the storage of gas or the protection of gas storage on lands in the general vicinity of said land.

J.A. 261.

Since entering into the Lease, EQT has not engaged in exploration, production, or gas storage on the Premises. It has, however, engaged in protection of gas storage. Equitrans, L.P., owns and operates a nearby natural gas storage facility known as the Shirley Storage Field, which is authorized and

------

hereby leases and lets unto the Lessee, for its exclusive possession and use for the purpose of exploring and operating for and producing and saving oil and gas by all methods now known or hereafter known or hereafter discovered, and of injecting gas, air, water or other fluids into any subsurface strata for the purpose of recovering and producing oil and gas, and of pooling or unitizing the same with other lands for such purposed [sic], as hereinafter more fully set out and for storing gas in the substrata thereof, and protecting stored gas . . . .

J.A. 260.

5

regulated by the Federal Energy Regulatory Commission ("FERC").[5] FERC established a 2,000-foot buffer zone around Shirley Storage Field for the protection of the gas storage facilities. It is undisputed that part of this protective buffer zone falls on the Premises, and that therefore EQT is using a portion of the Premises for protection of storage of natural gas.

Because EQT has not used the Premises to engage in gas or oil production, K & D now seeks to enter into a more lucrative oil and gas lease agreement with Antero, Inc., but has been unable to do so because of the EQT Lease.

B.

On September 20, 2013, K & D filed a complaint against EQT in the circuit court of Tyler County, West Virginia. K & D primarily claimed that, because EQT has not produced and sold or used gas or oil on the Premises for a period of greater than twenty-four months, K & D was entitled to a rebuttable presumption under West Virginia law that EQT has abandoned the Lease. See W. Va. Code § 36-4-9a.[6]

---

[5] FERC has regulatory authority pursuant to the Natural Gas Act of 1938, 15 U.S.C. §§ 717 et seq.

[6] This provision reads, in relevant part, as follows:

> There is a rebuttable legal presumption that the failure of a person, firm, corporation, partnership or association to produce and sell or produce and use for

(Continued)

6

EQT removed the case to the United States District Court for the Northern District of West Virginia, where the parties subsequently filed cross motions for summary judgment. K & D claimed that, because EQT "has expended no money to explore, test, or drill for over twenty years," J.A. 81, the Lease was therefore "cancelled by operation of law." J.A. 84. K & D further argued that it should be permitted to lease the unused portion of the Premises to another corporation for oil and gas production and stated that any drilling permitted on the leased area would not affect the protective zone for storage in use by EQT.

EQT, on the other hand, argued that West Virginia Code § 36-4-9a by its terms does not apply to leases for gas storage purposes. Instead, the "plain and unambiguous terms" of the Durational Provision, which contain no requirement that gas or oil be produced in order to hold the Lease, were determinative of the abandonment issue. J.A. 91.

---

its own purpose for a period of greater than twenty-four months, . . . oil and/or gas produced from such leased premises constitutes an intention to abandon any oil and/or gas well and oil and/or gas well equipment situate [sic] on said leased premises . . . .

W. Va. Code § 36-4-9a.

7

On September 30, 2014, the district court denied the cross motions for summary judgment. The district court rejected K & D's argument that West Virginia Code § 36-4-9a operated to terminate the Lease, observing that this provision "specifically states that the rebuttable presumption does not apply to leases for gas storage purposes." J.A. 158. Thus, the provision had "no bearing" on the outcome of the case. Id.

The district court also rejected EQT's interpretation of the Durational Provision. Acting sua sponte, the district court found as a matter of law that the Lease was divisible or severable, rather than entire. J.A. 156. The district court reasoned:

> [The lease agreement] has two purposes for the lease of the land, the exploration for and the production of oil and gas versus the use of the property for the storage of gas and the protection of stored gas. A separate consideration is stated for each. The fact that the leases indicate that the lessee is not obligated to drill any wells is further evidence that the terms of each are not interrelated, as is the fact that the lessee has taken no steps whatsoever to develop the oil and gas underlying the property.

J.A. 157–58. The district court then considered the segment of the Lease relating to production of oil and gas and concluded that given that the initial five-year lease term had elapsed without EQT attempting to explore for or produce oil or gas, this segment had expired. Because EQT is using a portion of the Premises for protection of gas storage, however, the district

8

court concluded that the segment of the Lease relating to gas storage and the protection of gas storage remains in effect.

The district court determined that "the resolution of these issues leaves general issues of material fact," such as whether the entire Premises was necessary for gas storage and whether drilling from an area of the Premises "not necessary for gas storage protection would interfere with gas protection." J.A. 158–59.

EQT subsequently moved for reconsideration, arguing both that the district court's finding of severability was erroneous and that the district court acted improperly by raising this issue sua sponte without giving the parties notice or an opportunity to respond prior to issuing its order denying the cross motions for summary judgment. The district court denied this motion.

In anticipation of the district court making a final ruling, the parties jointly filed stipulations before the court that resolved all remaining factual issues "with the understanding and agreement that by entering into these stipulations the parties are not waiving any objections or rights to appeal any rulings by the Court, including those contained in the Order Denying Cross Motions for Summary Judgment." J.A. 253.

The district court issued its final order on January 21, 2015. The court reiterated its conclusion from its previous order that the lease at issue was divisible and that the segment of the lease for the purpose of exploration for and production of oil and gas had expired. Given this, and taking into account the stipulations made by the parties, the district court concluded that "the plaintiff may drill exploration and production wells on areas which are not within the gas storage protection area and which extend horizontally under the gas storage protection to the Marcellus Shale area." J.A. 287.

EQT timely appealed.

II.

EQT raises two arguments on appeal: (1) that the district court erred as a matter of law in holding that the Lease was divisible into separate segments, one for exploration and production, and one for storage and protection of storage; and (2) that the district court erred in finding that the "segment" of the Lease for exploration and production had terminated after its initial five-year lease term. In essence, this appeal asks us to resolve whether the Lease required EQT to explore for or produce oil or gas beyond the initial five-year period in order to maintain its production rights, or whether, instead, EQT

10

preserved all of its rights under the Lease by exercising just one of them, protection of gas storage.

We consider each of EQT's arguments in turn, reviewing the district court's findings of fact for clear error and its conclusions of law de novo. Perez v. Mountaire Farms, Inc., 650 F.3d 350, 363 (4th Cir. 2011). As this court's jurisdiction is based on diversity of citizenship, we apply West Virginia law to the facts of this case. See Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 722 (4th Cir. 2000).

A.

EQT argues that the district court erred in finding sua sponte that the Lease was divisible. We agree.

EQT argues that the Durational Provision, stating that the lessee would have and hold the land and its privileges "as long after commencement of operations as said land . . . is operated for the exploration or production of gas or oil, or as gas or oil is found in paying quantities . . . , or as long as said land is used for the storage of gas or the protection of gas storage," J.A. 261 (emphasis added), is clear: "the unambiguous language of the Lease means that EQT had to do only one of the alternative acts in order to keep the entire Lease in effect, including EQT's right to produce oil and gas." Appellants' Br. at 9. K & D argues that to adopt this interpretation would be contrary to West Virginia public policy and would conflict with

11

the intent of the parties "to enter into a contract that would be beneficial to both parties." Appellee's Br. at 9.

### B.

In general, West Virginia contract law principles apply equally to the interpretation of leases. See Energy Dev. Corp. v. Moss, 591 S.E.2d 135, 143 (W. Va. 2003). Under West Virginia law, "the primary criterion" for determining if a contract is severable "is the intention of the parties as reflected from a fair construction of the terms of the contract itself, the subject matter of the contract and the circumstances which gave rise to the question." Quinn v. Beverages of W. Va., Inc., 224 S.E.2d 894, 900 (W. Va. 1976). A severable contract is one that is "susceptible of division and apportionment," while a contract that is not severable has material provisions and consideration that "are common each to the other and interdependent." Dixie Appliance Co. v. Bourne, 77 S.E.2d 879, 881 (W. Va. 1953). Further, "[t]here is a presumption against finding a contract divisible unless divisibility is expressly stated in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise clearly manifested." 15 Williston on Contracts § 45:4 (4th ed. 2000)(footnotes omitted).

In this case, a fair construction of the terms of the Lease compels the conclusion that the Lease was intended to be entire,

12

not divisible. To hold otherwise would be to ignore the disjunctive use of the word "or" in the Durational Provision. The Lease expressly sets out a list of activities and makes plain that engaging in any one of them constitutes an exercise of rights such that the entirety of the Lease would remain in effect. As the West Virginia Supreme Court of Appeals has held, "the word 'or' . . . in the absence of a contrary intent of the parties appearing from other parts of the lease, [shall] be given its ordinary meaning and not considered as meaning 'and.'" Syl. Pt. 1, Little Coal Land Co. v. Owens-Ill. Glass Co., 63 S.E.2d 528, 529 (W. Va. 1951).

K & D argues that the fact that the Lease contains provisions for separate monetary consideration for distinct activities renders it severable under Regent Waist Co. v. O.J. Morrison Department Store Co., 106 S.E. 712 (W. Va. 1921). In Regent Waist Co., a case involving a contract for different types of garments, the Supreme Court of Appeals of West Virginia held that "[w]here a retail merchant orders from a manufacturer of shirtwaists a number of such waists of different kinds and qualities, a definite price being fixed for each of such different kinds and qualities, such contract is separable in the absence of any circumstance indicating the contrary." Id. Syl. Pt. 2, at 712.

13

It is true that the Lease requires the lessee to pay different rents or royalties depending on the activities in which the lessee engages. However, these activities are interrelated and quite different in kind from the transactions at issue in Regent Waist Co., so the same logic does not apply when interpreting the Lease at issue here. Rather than this Lease being "made up of several distinct items," there is instead an "intimate connection" between the different rights bargained for. Id. at 714. Therefore, "it can safely be said that the contract is entire." Id.

Finally, K&D argues that under West Virginia law, the "general rule" is that oil and gas leases will "be liberally construed in favor of the lessor." Appellee's Br. at 22 (citing Martin v. Consolidated Coal & Oil Corp., 133 S.E. 626 (W. Va. 1926)). This is so, but only when there is ambiguity as to the meaning of the lease terms. "Where the intent of the parties is clear, [the Supreme Court of Appeals of West Virginia] will not use the vehicle of interpretation to relieve one party of a bad bargain." Pechenik v. Baltimore & O.R. Co., 205 S.E.2d 813, 815 (W. Va. 1974).[7]

---

[7] We find K & D's arguments based on vague notions of fairness and West Virginia public policy similarly unavailing in interpreting a lease the text of which is unambiguous.

14

Because we agree with EQT that the language of the Durational Provision is clear and that the Lease does not evince any intent of the parties to enter into a divisible lease agreement, we conclude that the district court erred in holding to the contrary.

C.

The district court's determination that EQT's production and exploration rights had terminated as a result of non-use during the initial five-year lease term was based on the erroneous premise that the Lease was divisible. Having concluded that the Lease is not divisible, we next consider whether EQT has continuing rights under the Lease under the requirements of the Durational Provision found in Article IV.

Under the Durational Provision, a lessee will maintain continuing rights under the Lease beyond the initial five-year term so long as (1) the lessee explores for or produces gas or oil; (2) "gas or oil is found in paying quantities thereon or stored thereunder"; or (3) the "land is used for the storage of gas or the protection of gas storage on lands in the general vicinity of said land." J.A. 261. The parties have stipulated that "a portion of the 180 Acre Lease falls within the protective zone of the Shirley Storage Field." J.A. 254. Thus, EQT is using a portion of the land for protection of gas storage, one of the rights conferred by the Lease. Because

15

there is no disagreement that EQT is indeed engaging in one of the activities enumerated in the Durational Provision of the Lease, we find that EQT continues to hold all rights under the original Lease.

## III.

For the foregoing reasons, the judgment of the district court is

<u>REVERSED AND REMANDED WITH INSTRUCTIONS
TO ENTER JUDGMENT FOR EQT</u>.

16